1  **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7               **FOR THE DISTRICT OF ARIZONA**

8

Steven Craig James,                    )

9                                       )      No. CV-00-1118-PHX-NVW
              Petitioner,               )

10                                      )      DEATH PENALTY CASE
         v.                             )

11                                      )
Dora B. Schriro, et al.,                )      **MEMORANDUM OF DECISION**

12                                      )      **AND ORDER**
                                        )

13            Respondents.              )
                                        )

14 _____     )

15        Steven Craig James ("Petitioner") has filed an Amended Petition for Writ of Habeas

16 Corpus pursuant to 28 U.S.C. § 2254 alleging that he is imprisoned and sentenced to death

17 in violation of the United States Constitution.  (Dkt. 18.)[1]  In this order, the Court reviews

18 the merits of Petitioner's properly exhausted claims and his requests for discovery, expansion

19 of the record, and an evidentiary hearing.  (Dkt. 108.)

20                            **BACKGROUND**

21        In the companion case of *State v. Libberton*, the Arizona Supreme Court provided the

22 following summary of the facts surrounding the crimes and Petitioner's arrest:[2]

23 _____

24      [1]      "Dkt." refers to the documents in this Court's file.

25      [2]      Co-defendant Libberton was tried separately, convicted, and sentenced to

26 death.  In its decision in Petitioner's case, the Arizona Supreme Court referred to the facts
   set forth in its ruling in Libberton's direct appeal.  *State v. James*, 141 Ariz. 141, 685 P.2d

27 1293 (1984). For ease of reference, "Libberton" is substituted for "Appellant" in the material
   quoted from *State v. Libberton*.

In the early morning hours of November 17, 1981, the victim, Juan Maya, picked up a hitchhiker, Martin Norton. Norton, a 14-year-old, lived with a friend, Steven James, in a mobile home trailer located in Phoenix. Maya drove to the trailer and, according to Norton, made homosexual advances. Norton resisted and told Maya he should go in the trailer because there was a homosexual there who could satisfy Maya's desires. Maya entered the trailer, which was occupied at the time by James and [another friend, Lawrence] Libberton. Norton told James that Maya was gay and to get rid of him. James then kicked Maya in the crotch, and Maya left the trailer and ran. James and Libberton pursued Maya and brought him back to the trailer. Norton testified that Maya's nose and mouth were bleeding when he was brought back to the trailer.

Once again, in the trailer, Norton, James and Libberton took turns hitting Maya in the face. Maya pleaded with them to take his car and credit cards and quit hitting him. James had a gun in his hand and took Maya's wallet. From the wallet, Libberton obtained the title to Maya's car, and forced Maya to sign the title over to Libberton. James took Maya's bracelet and ring. Libberton put on Maya's belt, which had Maya's name engraved on the back, and said, "[n]ow that I own Juan Maya's car I might as well be Juan Maya."

The three assailants then discussed, in Maya's presence, what to do with Maya. James said "[t]he only thing we can do is kill him." Libberton agreed. Next, James suggested the three could hide the body in a mine shaft on his parents' property in Salome. Libberton agreed, and at gunpoint forced Maya into Maya's car. Libberton kept the gun pointed at Maya all the way to Salome, approximately a two-hour drive from the trailer. On the way, James bought gas and cigarettes with Maya's credit cards. Later, along the highway to Salome, a police officer stopped the car for speeding. James, the driver, got out of the car and talked to the officer. Libberton threatened to shoot Maya if he said anything. James got back in the car and the group proceeded to Salome.

The group arrived at James' parents' property shortly before daybreak. Libberton handed the gun to James who ordered Maya to walk up the side of a small mountain to the mine shaft. Maya requested and was allowed to smoke a cigarette. The assailants stood by Maya, allowing him to finish his cigarette, before beginning the final assault. When Maya finished his cigarette, James ordered Maya to step to the shaft, a hole about five feet in diameter with a beam across the top. Maya screamed "[d]on't kill me." James fired at Maya twice from less than five feet. (Only sparks and no bullets came out of the gun because, as established at trial, the gun was filled with debris.) Maya ran at James, grabbed the gun, struggled with James, and fell to the ground. Libberton grabbed a five-pound rock and began beating Maya on the back of the head and shoulders with it. Maya was still struggling with James for the gun. Norton handed Libberton a board, with which Libberton struck Maya on the back, forcing Maya to let go of the gun. James then shot in the direction of Maya's head. As before, only sparks came out of the gun. Maya was still conscious, making "gurgling sounds,"and moaning. Libberton grabbed the gun from James and fired it at Maya's head. Again, the gun malfunctioned. Maya was still not dead, so all three assailants picked up large rocks and slammed them on the back of Maya's head as Maya lay face down. After about five blows Maya lay unconscious. Libberton and James dragged Maya

to the mine shaft and threw him in.

Back in the car Libberton and James told Norton that if he told anyone they would kill him. The three returned to Phoenix. James told Norton to clean the trailer and remove Maya's blood from the couch. That morning Libberton and James picked up a [Daniel] McIntosh in Maya's car. The three assailants and McIntosh drove around. Libberton bought some shoes with one of Maya's credit cards. At noon the three assailants were captured when Libberton attempted to get a cash advance of $20 on Maya's MasterCard.

141 Ariz. 132, 135-36, 685 P.2d 1284, 1287-88 (1984).

At trial, Norton and McIntosh testified against Petitioner, and the prosecution introduced evidence that Petitioner had lead police to Maya's body. Petitioner also testified, claiming that he was coerced by Libberton and Norton to participate in the crime. A jury convicted Petitioner of first degree murder and kidnapping, and Maricopa County Superior Court Judge James Moeller sentenced him to death. On direct appeal, the Arizona Supreme Court affirmed. *State v. James*, 141 Ariz. 141, 685 P.2d 1293, *cert. denied*, 469 U.S. 990 (1984).

In November 1984, Petitioner filed his first petition for post-conviction relief ("PCR") in the trial court. (Dkt. 27, Ex. B.) Subsequently, counsel was appointed and filed a supplement to the PCR petition. (*Id.*, Ex. C.) The PCR court determined that all of Petitioner's claims were procedurally precluded and summarily denied relief. (*Id.*, Exs. D, E; Dkt. 109, Ex. 13.) Petitioner submitted a petition for review of the PCR court's ruling to the Arizona Supreme Court, which summarily denied relief. (Dkt. 27, Ex. F.)

In 1986, Petitioner filed a petition for writ of habeas corpus in this District, Case No. CIV-86-587-PHX-RGS. On January 25, 1989, the Court dismissed the petition without prejudice, to allow Petitioner to return to state court to exhaust certain claims. Petitioner filed a second PCR petition in state court in July 1990. (Dkt. 27, Ex. G.) In February 1991, counsel filed a supplemental PCR petition. (*Id.*, Ex. H.) The court summarily denied relief and a motion for rehearing. (*Id.*, Exs. I, J.) The Arizona Supreme Court summarily denied a petition for review. (Dkt. 27, Ex. K.)

In 1993, Petitioner returned to this Court and filed a new petition for writ of habeas corpus, Case No. CIV-93-0869-PHX-RGS.  On January 27, 1994, the Court again dismissed the petition without prejudice, allowing Petitioner to return to state court to exhaust certain claims.  Petitioner filed a third PCR petition in March 1995.  The petition was denied in May 1999 (Dkt. 133, Ex. A), and the Arizona Supreme Court summarily denied review (Dkt. 27, Exs. N, P).

On June 29, 2000, Petitioner returned to this Court and filed a habeas petition.  (Dkt. 1.)  After an amended petition was filed, Respondents filed an answer, limited by the Court's order to issues of exhaustion and procedural default.  (Dkt. 26.)  Briefing concluded in November 2001, Petitioner having filed a traverse, Respondents a reply, and Petitioner a sur-reply.  (Dkts. 41, 43, 53, 56.)  On July 24, 2006, the Court issued an order on the procedural status of Petitioner's claims, dismissing Claims 9, 13, 14, 17, 19, and 30-32 based on procedural bar, dismissing Claim 7 as not cognizable on federal habeas review, and denying Claims 26 and 33 on the merits as a matter of law.  (Dkt. 79 at 21.)  The Court ordered the parties to brief the merits of Claims1-6, 8, 10-12, 15, 16, 18, 20-25, and 27-29.  (*Id.*)  In his brief on the merits, Petitioner withdrew from consideration Claims 11, 16, 18, 20-25 and 27-29.  (Dkt. 108 at 1.)  As a result, the only claims remaining for consideration on the merits are Claims 1-6, 8, 10, 12, and 15.  (*See id.*)

## DISCUSSION

## I.     AEDPA Standard for Habeas Relief

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

1    28 U.S.C. § 2254(d).  The phrase "adjudicated on the merits" refers to a decision resolving

2    a party's claim which is based on the substance of the claim rather than on a procedural or

3    other non-substantive ground.  *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).  The

4    relevant state court decision is the last reasoned state decision regarding a claim.  *Barker v.*

5    *Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-

6    04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

7            "The threshold question under AEDPA is whether [petitioner] seeks to apply a rule

8    of law that was clearly established at the time his state-court conviction became final."

9    *Williams v. Taylor*, 529 U.S. 362, 390 (2000).  Therefore, to assess a claim under subsection

10   (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs

11   the sufficiency of the claims on habeas review.  "Clearly established" federal law consists

12   of the holdings of the Supreme Court at the time the petitioner's state court conviction

13   became final.  *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 127 S. Ct. 649 (2006);

14   *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).  Habeas relief cannot be granted if

15   the Supreme Court has not "broken sufficient legal ground" on a constitutional principle

16   advanced by a petitioner, even if lower federal courts have decided the issue.  *Williams*, 529

17   U.S. at 381.  Nevertheless, while only Supreme Court authority is binding, circuit court

18   precedent may be "persuasive" in determining what law is clearly established and whether

19   a state court applied that law unreasonably.  *Clark*, 331 F.3d at 1069.

20           The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

21   The Court has explained that a state court decision is "contrary to" the Supreme Court's

22   clearly established precedents if the decision applies a rule that contradicts the governing law

23   set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

24   Supreme Court on a matter of law, or if it confronts a set of facts that is materially

25   indistinguishable from a decision of the Supreme Court but reaches a different result.

26   *Williams*, 529 U.S. at 405-06; *see Early v. Packer,* 537 U.S. 3, 8 (2002) (per curiam).  In

27   characterizing the claims subject to analysis under the "contrary to" prong, the Court has

observed that "a run-of-the-mill state-court decision applying the correct legal rule to the facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court may grant relief where a state court "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.  In order for a federal court to find a state court's application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner must show that the state court's decision was not merely incorrect or erroneous, but "objectively unreasonable."  *Id.* at 409; *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state court decision was based upon an unreasonable determination of the facts.  *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  In considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240.  However, it is only the state court's factual findings, not its ultimate decision, that are subject to § 2254(e)(1)'s presumption of correctness.  *Miller-El I*, 537 U.S. at 341-42 ("The clear and convincing evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-court determinations of factual issues, rather than decisions.").

1   As the Ninth Circuit has noted, application of the foregoing standards presents
2   difficulties when the state court decided the merits of a claim without providing its rationale.
3   *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160,
4   1167 (9th Cir. 2002); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000).  In those
5   circumstances, a federal court independently reviews the record to assess whether the state
6   court decision was objectively unreasonable under controlling federal law.  *Himes*, 336 F.3d
7   at 853; *Pirtle*, 313 F.3d at 1167.  Although the record is reviewed independently, a federal
8   court nevertheless defers to the state court's ultimate decision.  *Pirtle*, 313 F.3d at 1167
9   (citing *Delgado*, 223 F.3d at 981-82); *see also Himes*, 336 F.3d at 853.  Only when a state
10  court did not decide the merits of a properly raised claim will the claim be reviewed de novo,
11  because in that circumstance "there is no state court decision on [the] issue to which to
12  accord deference."  *Pirtle*, 313 F.3d at 1167; *see also Menendez v. Terhune*, 422 F.3d 1012,
13  1025-26 (9th Cir. 2005); *Nulph v. Cook*, 333 F.3d 1052, 1056-57 (9th Cir. 2003).

14  **II.   Evidentiary Development Standard**

15  With respect to all but one of his remaining claims, Petitioner requests an evidentiary
16  hearing and/or expansion of the record and further discovery.  (Dkt. 108 at 98-111.)  The
17  Court will address Petitioner's specific requests for evidentiary development in conjunction
18  with the merits of his individual claims.  In doing so, the Court applies the relevant
19  provisions of 28 U.S.C. § 2254(e)(2):

20  If the applicant has failed to develop the factual basis of a claim in State court
21  proceedings, the court shall not hold an evidentiary hearing on the claim unless
    the applicant shows that –

22  (A) the claim relies on –

23          (i) a new rule of constitutional law, made retroactive to cases on
24          collateral review by the Supreme Court, that was previously
            unavailable; or

25          (ii) a factual predicate that could not have been previously discovered
            through the exercise of due diligence; and
26
27  (B) the facts underlying the claim would be sufficient to establish by clear and
    convincing evidence that but for constitutional error, no reasonable factfinder

1   would have found the applicant guilty of the underlying offense.

2   Section 2254(e)(2) similarly limits a petitioner's ability to present new evidence

3   through a motion to expand the record pursuant to Rule 7 of the Rules Governing Section

4   2254 Cases.[3] *See Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (holding

5   that the conditions of § 2254(e)(2) generally apply to petitioners seeking relief based on new

6   evidence, even when they do not seek an evidentiary hearing) (citing *Holland v. Jackson*, 542

7   U.S. 649, 652-53 (2004) (per curiam)).

8   The Supreme Court has interpreted subsection (e)(2) as precluding an evidentiary

9   hearing in federal court if the failure to develop a claim's factual basis is due to a "lack of

10  diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."

11  *Williams v. Taylor*, 529 U.S. 420, 432 (2000).  A hearing is not barred, however, when a

12  petitioner diligently attempts to develop the factual basis of a claim in state court and is

13  "thwarted, for example, by the conduct of another or by happenstance was denied the

14  opportunity to do so."  *Id.*; *see Baja v. Ducharme*, 187 F.3d 1075, 1078-79 (9th Cir. 1999)

15  (allowing hearing when state court denied opportunity to develop factual basis of claim).

16  The diligence assessment is an objective one, requiring a determination of whether

17  a petitioner "made a reasonable attempt, in light of the information available at the time, to

18  investigate and pursue claims in state court." *Williams*, 529 U.S. at 435.  For example, when

19  there is information in the record that would alert a reasonable attorney to the existence and

20  importance of certain evidence, the attorney fails to develop the factual record if he does not

21  make reasonable efforts to sufficiently investigate and present the evidence to the state court.

22  *See id.* at 438-39, 442; *Alley v. Bell*, 307 F.3d 380, 390-91 (6th Cir. 2002).  Absent unusual

23  circumstances, diligence requires that a petitioner "at a minimum, seek an evidentiary hearing

24

---

25  [3]   Rule 7 authorizes a federal habeas court to expand the record to include

26  additional material relevant to the determination of the merits of a petitioner's claims.  "The
materials that may be required include letters predating the filing of the petition, documents,

27  exhibits, and answers under oath, to written interrogatories propounded by the judge.
Affidavits may also be submitted and considered as part of the record."  Rule 7(b), Rules
Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

in state court in the manner prescribed by state law." *Williams*, 529 U.S. at 437; *see Bragg v. Galaza*, 242 F.3d 1082, 1090 (9th Cir. 2001). The mere request for an evidentiary hearing, however, may not be sufficient to establish diligence if a reasonable person would have taken additional steps. *See Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) (counsel failed to present affidavits of family members that were easily obtained without court order and with minimal expense); *Koste v. Dormire*, 345 F.3d 974, 985-86 (8th Cir. 2003); *McNair v. Campbell*, 416 F.3d 1291, 1299-1300 (11th Cir. 2005).

Pursuant to *Townsend v. Sain*, 372 U.S. 293, 312-13 (1963), *overruled in part by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), *and limited by* § 2254 (e)(2), a federal district court must hold an evidentiary hearing in a § 2254 case when: (1) the facts are in dispute; (2) the petitioner "alleges facts which, if proved, would entitle him to relief;" and (3) the state court has not "reliably found the relevant facts" after a "full and fair evidentiary hearing," at trial or in a collateral proceeding. *See also Hill v. Lockhart*, 474 U.S. 52, 60 (1985) (upholding the denial of a hearing when petitioner's allegations were insufficient to satisfy the governing legal standard); *Bashor v. Risley*, 730 F.2d 1228, 1233-34 (9th Cir. 1984) (hearing not required when claim must be resolved on state court record or claim is based on non-specific conclusory allegations); *see also Schriro v. Landrigan*, 127 S. Ct. 1933, 1940 (2007) ("Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate."). Thus, Petitioner is entitled to an evidentiary hearing on a claim only if he alleges "facts that, if proven, would entitle him to relief." *Turner v. Calderon,* 281 F.3d 851, 890 (9th Cir. 2002) ("[e]ntitlement to an evidentiary hearing based on alleged ineffective assistance, for example, requires a showing that if his allegations were proven at the evidentiary hearing, deficient performance and prejudice would be established") (quoting *Tapia v. Roe,* 189 F.3d 1052, 1056 (9th Cir. 1999)).

1

**III.    Claims 1-6 and 8**

2

    **Claim 1 - The State Violated Petitioner's Rights When it Failed to Disclose an Agreement it Made with Martin Norton**

3

4

    Petitioner asserts that his due process and confrontation rights under the Sixth

5

Amendment were violated when the State failed to disclose the existence of a pretrial

6

agreement between witness Martin Norton and the prosecutors that preceded Norton's

7

December 29, 1981 sworn statement.  Specifically, Petitioner alleges that the prosecution

8

failed to disclose the existence of an oral agreement between Norton and prosecutors

9

whereby the State agreed to try Norton as a juvenile in return for a sworn statement

10

implicating Petitioner in Maya's murder.  Petitioner contends that the prosecution's failure

11

to disclose this information amounted to an unconstitutional withholding of exculpatory

12

information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United*

13

*States*, 405 U.S. 150 (1972).

14

    <u>Background</u>

15

    Martin Norton, the prosecution's chief witness, was a fourteen-year-old friend of

16

Petitioner at the time of the murder.  He was arrested along with Petitioner and Libberton

17

several hours after Maya's murder.  In an initial interview with police on November 19,

18

1981, two days after the murder, Norton denied his own involvement but implicated

19

Petitioner and Libberton in Maya's disappearance.  (*See* Dkt. 19, Exs. 4 and 5.)  In an

20

interview conducted about a week later with Detective Jack Hackworth, Norton for the first

21

time admitted his own involvement in Maya's murder and described how he, Petitioner, and

22

Libberton beat Maya at Petitioner's trailer, and then drove him to a remote area where they

23

beat him to death.  (*Id*., Ex. 6 at 1-2.)  Subsequently, on December 29, 1981, Petitioner

24

provided a formal, sworn statement.  Thereafter, the prosecution presented him with a plea

25

agreement in exchange for testimony at trial consistent with his December 29 statement.

26

    At trial, Norton testified that Petitioner came up with the idea of killing Maya and

27

disposing of his body in an abandoned mine shaft on the property of Petitioner's parents.

(RT 9/27/82 at 773-75.)[4]   Norton further testified that upon arriving at the mine shaft, Petitioner and another accomplice, Lawrence Libberton, forced Maya to get out of the car at gunpoint, then attempted to shoot Maya.  He testified that after the gun misfired, Petitioner and Maya engaged in a scuffle which ended when Petitioner, Libberton, and Norton bludgeoned Maya to death with rocks and a piece of plywood.  According to Norton, Petitioner and Libberton then dragged Maya's lifeless body to the mine shaft and dropped it in.  (*Id.* at 785-92.)  This testimony was consistent with Norton's December 29 statement. (*See* Dkt. 19, Ex. 8 at 8-18.)

Norton admitted during direct examination that he was not truthful in his initial pretrial interviews with police:

[PROSECUTOR]: And you had also been stopped and questioned by the police, is that right?

[NORTON]: Yes.

[PROSECUTOR]: Did you tell them the truth?

[NORTON]: No.

[PROSECUTOR]: Why not?

[NORTON]: Because I was scared.

[PROSECUTOR]: Why were you afraid?

[NORTON]: Because I didn't want to be arrested for murder.

[PROSECUTOR]: Were you also afraid of Steven James?

[NORTON]: A little bit.

[PROSECUTOR]: And Larry Libberton?

[NORTON]: Yes.

. . . .

[PROSECUTOR]: A couple of days later you were picked up and taken down to the police station; is that correct?

---

[4]   "RT" refers to the reporter's transcripts of Petitioner's trial.  A set of original transcripts were provided to this Court by the Arizona Supreme Court on December 27, 2000.  (*See* Dkt. 12.)

[NORTON]: Yes.

[PROSECUTOR]: And at that time you were interviewed by Detective Russ Davis, the gentleman sitting beside me?

[NORTON]: Yes.

[PROSECUTOR]: Did you tell him the truth?

[NORTON]: No.

[PROSECUTOR]: Did you tell him partially though what had happened?

[NORTON]: Yes.

[PROSECUTOR]: Why didn't you tell him the truth?

[NORTON]: Because I was scared.

(RT 9/27/82 at 806, 808-09.)

Norton further testified that he was not promised anything prior to any of his pretrial statements, including the sworn statement on December 29:

[PROSECUTOR]: And you told [Hackworth] basically what happened to Juan Maya at that time, didn't you?

[NORTON]: Yes.

[PROSECUTOR]: And you partially admitted your part in the crime, didn't you?

[NORTON]: Yes.

[PROSECUTOR]: At that time you didn't know whether or not you were going to be treated as a juvenile or an adult, did you?

[NORTON]: No.

[PROSECUTOR]: And no promises have been made to you at all?

[NORTON]: No.

[PROSECUTOR]: You indicated to Detective Hackworth right at that time that you would testify against Steven James and Larry Libberton; correct?

[NORTON]: Yes.

[PROSECUTOR]: Now, subsequently sometime thereafter out at Durango [Jail] your attorney, Robert Wertsching and I and Detective Davis met with you; is that correct?

[NORTON]: Yes.

[PROSECUTOR]: Now, you weren't offered any kind of agreement at that time, were you?

[NORTON]: No.

[PROSECUTOR]: And I told you that I only want you to tell me the truth?

[NORTON]: Yes.

[PROSECUTOR]: And you did talk to me at that time, did you not?

[NORTON]: Yes.

[PROSECUTOR]: In fact you gave a statement?

[NORTON]: Yes.

[PROSECUTOR]: And you substantially told us exactly what had happened to Juan Maya and what you told the jury again today; is that correct?

[NORTON]: Yes.

[PROSECUTOR]: Then later, Mr. Norton, you entered into a plea agreement with the State upon the advice of your attorney; is that correct?

[NORTON]: Yes.

(RT 9/27/82 at 809-11.)

At trial, Norton identified the plea agreement, and it was moved into evidence by the prosecution.  (RT 9/27/82 at 811.)  On cross-examination, defense counsel elicited the fact that Norton's plea agreement provided that in return for truthful testimony consistent with his December 29, 1981 statement, Norton would be charged and punished as a juvenile, meaning he would be released from custody at the age of eighteen.[5]  (*Id*. at 848-50.)

---

[5]      Specifically, section 1 of Norton's plea agreement states:

Martin David Norton agrees to testify fully and truthfully in any proceedings determined to be necessary by the State of Arizona regarding the victim Juan Maya and/or in any criminal prosecution of Lawrence Keith Libberton and Steven Craig James.  On December 29, 1981, Martin David Norton provided information to Deputy County Attorney Myrna Parker and represented that information to be true.  If Martin David Norton's testimony is not substantially consistent with the information that he provided in the December 29, 1981 interview, then the State of Arizona shall have the option of withdrawing from this agreement and the agreement shall be void.

On cross-examination, Norton again acknowledged that he had lied both during his initial interviews with police and in his sworn December 29 statement to the prosecutor:

[COUNSEL]: Isn't it true that you have lied to both [Detective Davis and Detective Hackworth]?

[NORTON]: Yes.

[COUNSEL]: How many times did you lie to Detective Davis?

[NORTON]: I don't know.

. . . .

[COUNSEL]: Was it two times or three times?

[NORTON]: I don't know.

[COUNSEL]: It is so many times you don't remember; isn't that right?  About this.  You have lied so many times about this case, you don't know how many times you have lied to Detective Davis; isn't that true?

[NORTON]: I don't know.

[COUNSEL]: Did you lie to Detective Hackworth just once or more than once?

[NORTON]: I don't have any idea how many times I lied to him.

[COUNSEL]: About this case.  Not about anything else?

[NORTON]: I don't know.

. . . .

[COUNSEL]: And didn't the County Attorney say that all she wanted was the truth?

[NORTON]: Yes.

[COUNSEL]: Well, she didn't get the truth, all the truth, did she?

[NORTON]: No.

[COUNSEL]: Because why? Because you lied; isn't that right?

[NORTON]: Yes.

. . . .

[COUNSEL]: Well, were you lying back on the 29th of December, 1981, to

(Dkt. 108, Ex. 4.)

the County Attorney?

[NORTON]: Yes.

[COUNSEL]: And it says in this plea agreement that you had to have been telling the truth there back on the 29th, doesn't it?

[NORTON]: Yes.

[COUNSEL]: So what we know is that you are telling the truth that you have lied.  You admit that you are a liar?

[NORTON]: Yes.

. . . .

[COUNSEL]: When I talked to you on the 23rd of July, 1982, with your psychologist and James Vance, didn't you say, "I have a tendency to exaggerate and lie a lot, and I always have had the tendency to lie a lot"?

Did you tell me that?

[NORTON]: Yes.

[COUNSEL]: Was that a lie or the truth?

[NORTON]: The truth.

[COUNSEL]: So you have always been a liar?

[NORTON]: Not always.

(RT 9/27/82 at 817-19, 854-55.)

PCR Proceedings

Petitioner presented this claim in state court in his 1995 PCR petition.  To support his contention that the State failed to disclose that a deal had been made to try Norton as a juvenile prior to his December 29, 1981 statement, Petitioner proffered a 1993 affidavit from Norton's pretrial attorney, Robert Wertsching, which attested in pertinent part:

> 2)      As counsel to a minor charged with murder, it was essential for me to make all reasonable effort to assure that my client would not be remanded to adult court.  The prosecution had made a formal transfer request on the petition filed against my client.
>
> 3)      On my client's behalf, I had at least two conversations with the head prosecutor of the juvenile division of the Maricopa County Attorney's office on the subject of whether the County Attorney would agree not to seek transfer of Mr. Norton to adult court.
>
> . . . .

5)      At some point in time the head of the juvenile division indicated orally that if Mr. Norton would give a full and accurate statement to the County Attorney and would testify consistently with that statement at the trial of the adults who participated in the homicide offense, the County Attorney would not seek to have my client transferred to adult court.

6)      Thereafter, in expectation that these contingencies would be met by debriefing my client, I was present at the jail when my client gave a statement to Ms. Parker, Deputy County Attorney [and the prosecutor in Petitioner's case], in the presence of an investigator.

7)      At the time of the formal jail interview with Ms. Parker, my client and I expected that if my client was truthful in the debriefing and cooperated fully with the prosecution of the adult defendants, he would not be remanded to adult court. I have no information whether Ms. Parker was aware of my oral communications with the head of the juvenile division.

8)      Subsequent to a formal jail interview with Ms. Parker, my client and I signed a formal written agreement that conformed with the oral understanding I had previously reached with the juvenile division head.

(Dkt. 108, Ex. 2.)

Petitioner argued in his PCR petition that there had been an undisclosed "secret" oral agreement between the state and Norton's attorney prior to the written plea agreement in Norton's case and that Norton had relied on this oral agreement in giving his December 1981 statement. In denying relief on this issue, the PCR court assumed the existence of the agreement and concluded that such an agreement would have been used primarily for impeachment:

Petitioner maintains that knowledge of the alleged agreement was essential for challenging Norton's credibility. It is asserted the agreement explains Norton's motive for coming forward. . . . Prior to the time there was any agreement, Norton had already made statements to the police that incriminated the defendant. These statements were made before he was represented by counsel. Therefore, his motive was not based on the agreement. Norton was a young man who admitted being involved in a murder. He was the eyewitness to a murder committed by the two adult defendants. He was in serious trouble. . . . Because there were prior statements made by Norton that implicated the defendant, Norton's motive for testifying was not the result of a "secret agreement."

The existence of the agreement has little impeachment value when coupled with the prior statements the witness made to the police. The defense had a copy of the plea agreement that was signed after Norton gave his statement to the prosecutor. The agreement was introduced in evidence. Norton was cross-examined about the plea agreement. He was questioned about prior inconsistent statements. The jury knew Norton had a motive to cooperate with authorities. The jury was aware that Norton had agreed to testify in exchange for not being tried as an adult. . . .

. . . .

The existence of the agreement would not have altered the verdict or sentence because there was overwhelming evidence of guilt against the defendant.  In addition to Norton's eyewitness testimony, the state presented defendant's confession to Daniel McIntosh, in which Petitioner bragged and smiled about his involvement in the abduction, beating, and shooting of Juan Maya.  Petitioner showed authorities where Juan Maya's body was disposed of in the mine shaft on property in Salome that belonged to his parents.  While at the mine shaft, and on the way back to Phoenix, Petitioner made inculpatory statements to the officers.  The statements he made were not suppressed. . . .

The jury heard defendant's testimony.  He admitted being present and participating in Juan Maya's murder.  The jury heard him say he was coerced to participate in the murder by a much smaller person, Libberton.  Yet, defendant admitted that he drove the group to the murder scene which was 100 miles from Phoenix, as Libberton did not know the location of the Salome property.  He testified he deliberately exceeded the speed limit in order to be pulled over by the police.  Yet, when he was pulled over and had gone to the rear of the vehicle to speak to the police officer, he failed to say anything about being coerced . . . .  The jury rejected his duress defense.  The trial judge characterized the defendant's version of events as "blatant perjury." (Special Verdict - Petitioner's Exhibit Y.)

. . . .

Petitioner claims he requested "all *Brady* material related to Norton's juvenile court plea negotiations."  After a diligent search of the defendant's discovery and *Brady* requests this court cannot find a specific request.  If there was a specific request the standard of "might have affected the outcome" is not met, due to the overwhelming evidence of guilt and the *Brady* material's minor impeachment value.  The outcome of the trial would not have been affected by knowledge of Norton's agreement.

Assuming the *Brady* request was not specific, the standard for materiality for general requests is whether "the omitted evidence creates a reasonable doubt [as to the defendant's guilt] that did not otherwise exist." *Bracy*, 145 Ariz. at 528, 703 P.2d at 472 (quoting *Agurs*, 427 U.S. at 112 ).  In *Agurs*, the Court explained that "the omission must be evaluated in the context of the entire record.  If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial." 427 U.S. at 112-113.  This court has already determined that the alleged *Brady* material was of minor impeaching value, and, additionally, there was overwhelming evidence of guilt.  Thus, the alleged agreement can create no reasonable doubt about Petitioner's guilt.

(Dkt. 133, Ex. A at 1-8, 10-11.)  The Arizona Supreme Court denied a petition for review without comment.  (Dkt. 27, Ex. P.)

Analysis

The government violates its obligation under *Brady* where (1) the evidence in question was favorable to the accused, (2) the government willfully or inadvertently suppressed the

- 17 -

evidence, and (3) prejudice resulted from the suppression (i.e., the evidence was "material"). *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). Evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see Banks*, 540 U.S. at 699; *Strickler*, 527 U.S. at 280. The duty to disclose includes impeachment as well as exculpatory material. *Bagley*, 473 U.S. at 676.

Regarding *Brady*'s prejudice prong, the Supreme Court has explained that materiality does not require a showing that the defendant would have been acquitted had the suppressed evidence been disclosed. *Kyles*, 514 U.S. at 434-35. Instead, a *Brady* violation occurs if "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the outcome." *Id*. at 435; *see Giglio*, 405 U.S. at 154 (new trial required where "false testimony could . . . in any reasonable likelihood have affected the judgement of the jury"). The test for materiality is the same whether the defense made no request, a general request, or a specific request for disclosure of the evidence. *Bagley*, 473 U.S. at 682.

Petitioner contends that the failure to disclose that Norton was offered a favorable deal in return for a statement implicating Petitioner violated *Brady* because it prevented jurors from understanding that Norton had a major incentive to cooperate with the State. (*Id*. at 5.) Respondents deny any deal was offered to Norton prior to his December 29, 1981 statement. (*See* Dkt. 129 at 13.) Nevertheless, even assuming that an oral agreement to try Norton as a juvenile was made in return for his December 29 statement, Petitioner cannot show a reasonable probability that disclosure of such information would have changed the outcome or put the case in a "new light" sufficient to undermine confidence in the verdict. *See Kyles*, 514 U.S. at 435.

The PCR court correctly noted that the jury was aware that Norton was offered a plea deal in which he would be tried as a juvenile and sentenced to confinement only until he

reached the age of eighteen. The plea agreement was admitted into evidence. The agreement provided that to obtain this leniency, Norton's testimony against Petitioner and Libberton must be "consistent" with his December 29 statement implicating them in the murder. The agreement further provided that the deal would be null and void if such testimony was not forthcoming. Thus, the jury knew that Norton had a motive to cooperate with the prosecution and that his lenient treatment was predicated on such cooperation.

Prior to any claimed contact between Norton's attorney and juvenile prosecutors, Norton had already recounted to police essentially the same facts regarding Petitioner's involvement in the killing of Juan Maya as the information provided in the December 29 statement and his subsequent trial testimony. This Court agrees with the state court's determination that these earlier statements implicating Petitioner could have effectively countered any claim that Norton's December 29 statement and trial testimony were not credible because they were prompted by a favorable plea deal. Further, defense counsel extensively impeached Norton's veracity, emphasizing that Norton was dishonest during numerous police interviews. (RT 9/27/82 at 817-19, 854-55.)

In addition, as noted by the PCR court, there was overwhelming evidence of Petitioner's guilt beyond Norton's testimony. Witness Daniel McIntosh testified that Petitioner confessed to killing Maya. (RT 9/22/82 at 488-89.) His testimony of what Petitioner told him is consistent with Norton's description of the events. (*See id.*) Petitioner himself testified at trial. He admitted that he showed authorities where the body was located. This was corroborated by Detective Davis's testimony. (RT 9/21/82 at 232-33.) Although Petitioner claimed he was coerced into participating in Maya's murder, the trial court at sentencing characterized his claims of duress and coercion as "blatant perjury" (RT 11/23/82 at 1458), and the jury, in finding him guilty, rejected this assertion as well.

For all these reasons, the Court concludes that had evidence of an oral agreement prior to Norton's December 1981 sworn statement been presented at trial, there is no reasonable probability that Petitioner would have been acquitted of the murder charge. As a result, the PCR court's denial of Petitioner's claim was not an unreasonable application of the principles

1    outlined in either *Brady* or *Giglio*.

2        Evidentiary Development

3        Petitioner requests a hearing to present "significant evidence" he was not permitted

4    to present in state court. In particular, Petitioner "wishes to obtain testimony from Norton

5    . . . that should show Norton was not merely asked to testify accurately but that his testimony

6    needed to implicate Mr. James." (Dkt. 108 at 8.) In addition, Petitioner seeks "to present

7    evidence that, had Norton's agreement been disclosed and the jury made aware of it, Mr.

8    James would not have testified, a concern that the state court lightly dismissed without

9    reasoned explanation." (*Id.*)

10        As discussed above, substantial evidence of guilt in addition to Norton's and

11    Petitioner's testimony was presented at trial. For this reason, and because the jury already

12    was aware that Norton had a strong motive to provide testimony consistent with his

13    December 1981 statement to police, Petitioner has not alleged facts which, if proved, would

14    entitle him to relief. *See Townsend*, 372 U.S. at 312-13. Thus, even assuming Petitioner

15    exercised due diligence in seeking evidentiary development in state court, he is not entitled

16    to further evidentiary development of this claim.

17        **Claim 2 - The State Allowed False Testimony by Norton**

18        Petitioner alleges that his rights were violated when the State refused to correct Martin

19    Norton's false testimony that he was not offered a deal in exchange for his December 29,

20    1981 statement. (RT 9/27/82 at 810-11.) Petitioner presented this claim in his 1995 PCR

21    petition. Citing *United States v. Agurs*, 427 U.S. 97 (1976), the state court rejected the claim,

22    stating that even presuming the existence of the "secret" pre-plea deal and the State's

23    knowledge:

24        [a] new trial is required [only] if "there is any reasonable likelihood that the
     false testimony could have affected the judgment of the jury." 427 U.S. at
25        103. . . .

26            In applying this standard the court is again faced with the overwhelming
     independent evidence of Petitioner's guilt, including his confession to
27        McIntosh and his own incredible testimony. Additionally, and as stated
     previously, the jury had substantial reason to question Norton's motives even
     without knowledge of the alleged agreement. They knew the nature of the deal

which followed the statement, and any reasonable jury would simply have questioned Norton's plain motive for making his statements: the hope for just such an agreement. . . .

The trial judge had a plethora of evidence to support the findings in the special verdict, aside from the testimony of witness Norton, concerning "especially heinous, cruel or depraved." For example, the victim, Juan Maya, was transported about 100 miles before he was killed. The trial judge knew the condition of the body, with all its wounds, and that the defendant bragged about the killing. Thus, there is no reasonable likelihood that either the testimony in question (Norton saying there was no deal before he made his statement on December 29, 1981) or the prosecutor's remarks to the jury in closing argument [that there was no deal prior to the December 29 statement] could have affected the jury's verdict, or the judge's sentence.

. . . The facts, even assuming their truth, do not raise a claim which would likely alter the verdict or sentence.

(Dkt. 133, Ex. A at 13-14.)

In *Napue v. Illinois*, the Court held that the knowing use of false evidence by the state, or the failure to correct false evidence, violates due process. 360 U.S. 264, 269 (1959). To prevail on a *Napue* claim, the petitioner must show that (1) the testimony was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material. *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc). For the purpose of *Napue* claims, materiality is determined by whether there is any reasonable likelihood that the false testimony could have affected the judgment of the jury, "in which case the conviction must be set aside." *Belmontes v. Brown*, 414 F.3d 1094, 1115 (9th Cir. 2005) (quoting *Agurs*, 427 U.S. at 103 (1976). "Under this materiality standard, [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984 (internal quotation omitted).

As explained with respect to Claim 1, the evidence at issue goes solely to Norton's credibility. Defense counsel extensively impeached Norton on cross examination, and the jury was aware of the plea agreement. In addition, Daniel McIntosh testified that Petitioner confessed to killing Maya, and the evidence at trial established that Petitioner inculpated himself by leading police to Maya's body. Thus, even assuming the existence of a pre-plea

1   oral agreement and the State's failure to correct Norton's denial of one, the state court's

2   determination that there was no constitutional violation because "there is no reasonable

3   likelihood [it] . . . could have affected the jury's verdict" was not an unreasonable application

4   of *Napue*.  Petitioner is not entitled to federal habeas relief on this claim.  In addition,

5   because Petitioner has not alleged facts that, if proved, would entitle him to relief, his request

6   for evidentiary development will be denied.  *See Townsend*, 372 U.S. at 312-13.

7   **Claim 3 - Petitioner's Rights Were Violated by the Consistency Clause of Norton's Plea Agreement**

8   Petitioner alleges that the provision in Norton's plea agreement requiring him to

9   testify in a manner "consistent" with his December 29 statement violated Petitioner's right

10  to due process.  Petitioner presented this claim in his 1995 PCR petition, in which he argued

11  that this "consistency clause" prevented Norton from providing evidence at trial that would

12  have supported a "diminished capacity" mitigating factor at sentencing.  (Dkt. 19, Ex. L at

13  25.)  To support this contention he proffered a 1991 affidavit from Norton wherein Norton

14  states that Petitioner was ingesting large amounts of mind-altering drugs in the weeks before

15  the homicide and that his behavior was greatly altered when he was under the influence of

16  such drugs.  (*Id.*; see also Dkt. 109, Ex. 11.)

17  In denying relief, the PCR court relied on *State v. Fisher* (*Fisher III*), 176 Ariz. 69,

18  74, 859 P.2d 179, 184 (1993):

19  
20       To constitute a due process violation, Petitioner needs to establish more than
         just the existence of a consistency clause.  The Petitioner is required to
21       demonstrate that the state "obtained a conviction through use of testimony that
         was tainted by an improper consistency provision."  *Fisher III* at 176 Ariz. 74.
22       In *Fisher* the witness was required to testify in a manner that inculpated the
         defendant, her husband, in the commission of a crime.  In exchange for that
23       testimony she would be granted leniency.  In this case, based on the "secret"
         agreement, the witness was required to give a **truthful** statement to
24       prosecutors and if a **truthful** statement was given and if there was cooperation,
         then the witness would get the benefits of a bargain.

25       Petitioner relies on Norton's 1991 affidavit to make a showing that the
         trial testimony was tainted by the requirement of consistency.  The conclusion
26       is inescapable that Norton's testimony was not tainted by the requirement of
         consistency.  Although the affidavit presents statements concerning
27       Petitioner's use of substances (which petitioner alleges would have supported
         a claim of mitigation at sentencing), the affidavit as a whole is consistent with
         his trial testimony.  Throughout the affidavit Petitioner is portrayed as the

leader and driving force behind the murder.

(Dkt. 133, Ex. A at 16-17.)

The PCR court relied on state case law in determining that testimony pursuant to the consistency provision in Norton's plea agreement did not rise to a violation of due process. Petitioner does not cite, and the Court has not identified, any Supreme Court or federal law holding that testimony by an accomplice witness pursuant to a consistency clause in a plea agreement violates due process of law under the Fourteenth Amendment. Because there is no clearly established Supreme Court law holding that accomplice testimony predicated on "consistency clause" provisions in plea agreements violates federal due process, Petitioner cannot obtain habeas relief on this claim. *See Cook v. Schriro*, 516 F.3d 802, 818 (9th Cir. 2008) (citing *Musladin*, 127 S. Ct. at 654); *Williams*, 529 U.S. at 381.

To the extent Petitioner seeks review of the state court's application of state precedent, namely *Fisher III*, it is not the province of a federal habeas court to review state court applications of state law.[6]  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Thus, as a matter of law, Petitioner is not entitled to relief, and his request for evidentiary development of the claim will be denied.

### Claim 4 - Petitioner's Due Process Rights Were Violated When the State Vouched for Norton's Credibility

Petitioner asserts the prosecutor "repeatedly suggested that she could guarantee Norton's truthfulness, and she characterized Norton's agreement to testify truthfully in an improper way." (Dkt. 108 at 19.) To support this contention, Petitioner cites the following exchange at trial:

> [PROSECUTOR]: Now, subsequently sometime thereafter out at Durango your attorney, Robert Wertsching and I and Detective Davis met with you, is that correct?
>
> [NORTON]: Yes.

---

[6]     The Court disagrees that *Fisher III* held that consistency clauses in plea agreements violate federal due process. In fact, the court avoided this question altogether, holding simply that such provisions are "unenforceable" under Arizona law. *See Fisher III*, 176 Ariz. at 73, 859 P.2d at 183.

[PROSECUTOR]: Now, you weren't offered any kind of plea agreement at that time, were you?

[NORTON]: No.

[PROSECUTOR]: And I told you that I only want you to tell me the truth?

[NORTON]: Yes.

[PROSECUTOR]: And you substantially told us exactly what had happened to Juan Maya and what you told the jury again today; is that correct?

[NORTON]: Yes.

[PROSECUTOR]: Then later, Mr. Norton, you entered into a plea agreement with the State upon the advice of your attorney; is that correct?

[NORTON]: Yes.

[PROSECUTOR]: Let me show you State's Exhibit 149 and ask if you recognize the document?

[NORTON]: Yes.

[PROSECUTOR]: . . . and in that agreement you agreed to testify truthfully and fully against Lawrence Libberton and Steven Craig James at any hearing that is necessary?

[NORTON]: Yes.

(RT 9/28/82 at 810-12.)

Petitioner contends that the prosecutor's statements that she was present when Norton gave his statement and told him to tell the truth, and that he then "told her exactly what happened," constitute improper vouching because they led the jury to believe that she personally believed in the witness's credibility. Furthermore, according to Petitioner, the comments strongly implied that the prosecutor was able to verify that Norton had told the truth because she apparently knew "exactly what happened." (Dkt. 108 at 20.)

The Arizona Supreme Court rejected this claim on direct appeal:

James argues that the prosecutor improperly vouched for the state's most important witness on direct examination, and James claims this conduct constitutes reversible error. Martin Norton was the state's only eyewitness. At the time of the crime he was fourteen years old, and he was a participant. On direct examination the prosecutor elicited that Norton had talked to the prosecutor before a plea agreement was reached and that Norton gave a statement. The prosecutor also elicited that Norton was then given a plea agreement in exchange for his truthful testimony. James argues that the state portrayed itself as the guarantor of the truthfulness of Norton's testimony. We

1   find this issue is controlled by *State v. McCall*, 139 Ariz. 147, 159, 677 P.2d
2   920, 932 (1983) (state may elicit this testimony on direct examination), and the
    claim is without merit.

3   *James*, 141 Ariz. at 146, 685 P.2d at 1298.

4   Analysis

5   Prosecutorial misconduct occurs when a prosecutor vouches for the credibility of a

6   witness. *United States v. Young*, 470 U.S. 1, 18-19 (1985); *Lawn v. United States*, 355 U.S.

7   339, 359-60 n.15 (1958); *United States v. Berger*, 295 U.S. 78, 86-88 (1935). "Vouching

8   consists of placing the prestige of the government behind a witness through personal

9   assurances of the witness's veracity, or suggesting that information not presented to the jury

10  supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th

11  Cir. 1993) (citing *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991); *United*

12  *States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980)). In *Necoechea*, the Ninth Circuit noted:

13          Vouching is especially problematic in cases where the credibility of witnesses
            is crucial, and in several cases applying the more lenient harmless error
14          standard of review, [courts] have held that such prosecutorial vouching
            requires reversal. At the same time, we have recognized that prosecutors must
15          have reasonable latitude to fashion closing arguments, and thus can argue
            reasonable inferences based on the evidence, including that one of the two
16          sides is lying.

17  986 F.2d at 1276 (citations omitted). To warrant habeas relief, Petitioner must show that any

18  vouching "so infected the trial with unfairness as to make the resulting conviction a denial

19  of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v.*

20  *DeChristoforo*, 416 U.S. 637 (1974)); *see also Davis v. Woodford*, 384 F.3d 628, 643-44 (9th

21  Cir. 2004) (applying *Darden* to claims involving prosecutorial vouching).

22  In *State v. McCall*, relied on by the Arizona Supreme Court in this case, the court held

23  that references to truthful testimony requirements on direct exam prior to any direct attack

24  by the defense are permissible.[7]  139 Ariz. at 159, 677 P.2d at 932.  Petitioner has not

25

26          [7]     In *McCall*, the Arizona Supreme Court held that bringing a "truthful
    testimony" provision in a prosecution witness's plea agreement to the attention of the jury
27  during direct examination was not improper where the prosecutor offered no personal
    opinion as to the witness's veracity or referred to any outside information not made available
    to the jury to bolster the witness's credibility.  139 Ariz. at 159, 677 P.2d at 932.

demonstrated that the holding in *McCall* is contrary to any United States Supreme Court precedent. *See Carey v. Musladin*, 127 S. Ct. at 654.

Under the Ninth Circuit's interpretation of Supreme Court law, the prosecutor's reference to her conversation with Norton in December 1981, her request that Norton tell the truth, her reliance on the provisions in the plea agreement requiring him to testify truthfully, and the admission of the agreement into evidence on direct examination, potentially constitute improper vouching. *See United States v. Lew*, 875 F.2d 219, 223 (9th Cir. 1989) (citing *United States v. Wallace*, 848 F.2d 1464, 1474 (9th Cir. 1988), for the proposition that "it was improper to allow the prosecution to elicit testimony on direct examination regarding the truthfulness requirement of a plea agreement"); *United States v. Shaw*, 829 F.2d 714, 717 (9th Cir. 1987) ("When the prosecution refers, as it did here, to the requirement of truthfulness before the issue of bias is drawn, it runs the risk that its reference will be interpreted as an attempt to establish truthfulness and suggest verifiability.") Nonetheless, in Shaw the court recognized that "what was said is more important than when it was said, at least in a case such as this one where an attack on the witness' credibility was almost certain to be forthcoming." *Id.* The court further concluded, based in part on the absence of "extra-record" references indicating verification of the witness's testimony, that the vouching did not materially affect the verdict. *Id.*

Applying these principles, Petitioner cannot establish that a constitutional violation resulted from the prosecutor's allegedly improper conduct. Nothing in the prosecutor's remarks suggested that she was able to discern that Norton was telling the truth or that she had information to this effect which was not made available to the jury. As in *Shaw*, it was a certainty that the defense would attack the witness's credibility. Norton, an eyewitness to Maya's murder and the State's key witness, was a troubled adolescent who had admitted his own participation in the crime. As anticipated, he was cross-examined vigorously. Defense counsel attacked his credibility, and Norton admitted he was prone to telling lies and could not count all the times he had lied to authorities during the course of the investigation. (*See* RT 9/27/82 at 817-19, 854-55.)

Moreover, Petitioner was not prejudiced by the prosecutor's remarks. This conclusion is supported by the totality of the evidence against Petitioner presented at trial. As already recounted, irrespective of Norton's testimony, the State presented other weighty evidence of guilt, including testimony from Daniel McIntosh that Petitioner confessed to killing Maya, as well as Petitioner's own inculpatory actions which led police to the body. For all of these reasons, Petitioner cannot show that the remarks of the prosecutor, or the references to and admission of the plea agreement into evidence, so infected the trial with unfairness that Petitioner was denied due process of law. *See Darden*, 477 U.S. at 181; *Davis*, 384 F.3d at 643-44. The Arizona Supreme Court's denial of relief on the vouching issue was neither contrary to nor an unreasonable application of clearly established federal law. Therefore, Petitioner is not entitled to habeas relief. Further, because Petitioner has not alleged facts that, if proved, would entitle him to relief, his request for evidentiary development will be denied. *See Townsend*, 372 U.S. at 312-13.

### Claim 5 - Petitioner's Due Process Rights Were Violated When the State Required Daniel Mcintosh to Testify in a Manner Consistent with His Previous Deposition Testimony

Petitioner asserts that his due process rights were violated when, after Daniel McIntosh's 1981 deposition but before trial, the prosecutor and another unidentified person representing the State threatened McIntosh with prosecution for perjury if he did not testify in a manner consistent with his deposition. (Dkt. 108 at 22.) Petitioner further alleges that his trial lawyer was not aware of this threat.

Background

At trial, McIntosh testified that Petitioner, Libberton, and Norton murdered Maya. According to McIntosh, Petitioner told him about the murder; the version Petitioner provided to McIntosh was essentially consistent with Norton's testimony. (*See* RT 9/22/82 at 484-89.) On December 28, 1981, approximately nine months prior to trial, McIntosh was deposed by the prosecutor and defense attorneys for Libberton and Petitioner. As with his trial testimony, McIntosh stated in his deposition that Petitioner told him that he, Libberton, and Norton had taken Maya to "the desert," shot and beat him, and dumped his body down a

mine shaft.  (PCR-ROA at 681 (1981 McIntosh Dep. at 24).)[8]

McIntosh also stated in his deposition that on the evening of the murder, he was at Petitioner's trailer where they had drunk beer and smoked pot.  (*Id.* at 8-9.)  He stated that they had a party and that he eventually left because he "was all messed up, drunk and stoned."  (*Id.* at 12.)  McIntosh estimated that he, Libberton, and Petitioner split a case of beer, although "there could have been a few beers left" when he departed Petitioner's trailer at about midnight.  (*Id.* at 39.)  At trial, however, McIntosh stated that Petitioner only drank "a couple of beers" that evening.  (RT 9/22/82 at 456.)

In his state PCR proceedings, Petitioner proffered a 1993 affidavit and deposition of McIntosh in support of this claim.  In his affidavit, McIntosh attested that Petitioner drank about twelve beers, smoked pot, and "dropped acid" on the evening prior to Maya's murder. (Dkt. 110, Ex. 20 at 2.)  McIntosh reiterated these assertions in a 1993 deposition.  (PCR-ROA at 740 (1993 McIntosh Dep. at 16-21).)

In denying relief on this claim, the PCR court stated:

> A deposition is testimony given under oath.  If a person's testimony at trial is not consistent with prior testimony given under oath, a perjury charge could be forthcoming and a prosecutor may properly advise a witness of that fact. *State v. Dumaine*, 162 Ariz. 392, 783 P.2d 1184 (1989).
>
> . . . .
>
> Petitioner relies on [McIntosh's 1993 deposition and affidavit] for demonstrating how he believes the witness would have testified if he had been able to testify "freely."  The affidavit presents statements about [James's] use of substances which he surmises would have established mitigation at sentencing.  Defendant's drug use could have been used as a mitigating circumstance, with or without the testimony of McIntosh.  The statements in the affidavit still incriminate the Petitioner.

(Dkt. 133, Ex. A at 19.)

<u>Analysis</u>

Petitioner contends that the threat to prosecute McIntosh if his trial testimony was not

---

[8]   "PCR-ROA" refers to seven volumes of pleadings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-1999-0474-PC) from the denial of relief on his third PCR petition.  These documents were provided to this Court by the Arizona Supreme Court on December 20, 2000.  (*See* Dkt. 12.)

consistent with his pretrial deposition is relevant because it dissuaded McIntosh from presenting testimony that Petitioner was very intoxicated with both drugs and alcohol the night of the murder.  Petitioner alleges that if this evidence had been presented prior to sentencing it would have supported a claim of mitigation and perhaps a request for a new trial.  (Dkt. 108 at 23.)

To warrant habeas relief, Petitioner must show that the State's actions rendered his trial fundamentally unfair in violation of federal due process.  *See Darden*, 477 U.S. at 181. In *State v. Dumaine*, cited by the PCR court, the Arizona Supreme Court held that merely advising a witness that he might face perjury charges if he testified contrary to previous sworn testimony does not violate a defendant's right to due process of law.  162 Ariz. 392, 400, 783 P.2d 1184, 1192 (1989).  Petitioner has cited no United States Supreme Court authority contradicting this holding.  In fact, in *Dumaine* the court cited *United States v. Risken*, 788 F.2d 1361 (8th Cir. 1986), in which the Eighth Circuit explained:

> "It is not improper *per se* for a . . . prosecuting attorney to advise prospective witnesses of the penalties of testifying falsely.  But warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify." *United States v. Blackwell*, 224 U.S.App. D.C. 350, 694 F.2d 1325, 1334 (1982) (citations omitted).  The prosecutor's statements in the present case do not approximate the sort of governmental misconduct held unconstitutional in the leading case of *Webb v. Texas*, 409 U.S. 95, 98, 93 S. Ct. 351, 353 (1972) (per curiam), in which the trial court gratuitously and at great length admonished only the defendant's single witness not to lie and warned him of the dire consequences of perjury. . . .  The prosecutor's remarks here were limited to warning [the witness] about the serious consequences of perjury in the context of [the witness's] testimony in this case; the prosecutor did not threaten to prosecute [the witness] for other crimes or to retaliate against him if he testified truthfully.

788 F.2d at 1370-71.

The passages from McIntosh's 1993 deposition cited by Petitioner do not support a due process violation.  During that deposition, the following exchange occurred:

> [ATTORNEY]: Okay.  Now, who made the statement – when [the Deputy County Attorney] and this man were reviewing your deposition with you prior to your trial testimony, who made the statement that your trial testimony had to be consistent with your deposition testimony?

> [MCINTOSH]: I couldn't tell you the person's name . . .

[ATTORNEY]: It wasn't the [Deputy County Attorney], then?

[MCINTOSH]: I don't remember if it was her or the other guy . . . .

But I believe today that [it] was stated to me that everything had to be consistent with what was already stated, that I couldn't change anything while I was up on the stand because they had my deposition right there with them. And they made that very plain to me, . . . very evident . . . that anything I said on the stand had to coincide with what I had already stated.

[ATTORNEY]: Or else what would happen?

[MCINTOSH]: I would get perjury – I would be prosecuted for perjury.

[ATTORNEY]: Because you gave your deposition under oath, also, didn't you?

[MCINTOSH]: Yes, sir.

[ATTORNEY]: Now did [the Deputy County Attorney] or the gentleman ever tell you, "Even if something you told us in the deposition is not true, you better say the same thing you said at trial?"

[MCINTOSH]: Not exactly like that, no.  No.

(PCR-ROA at 740 (1993 McIntosh Dep. at 54-55).)

Nothing in this passage indicates the use of threats or coercion beyond the statement that McIntosh could be prosecuted for perjury if his trial testimony was inconsistent with the sworn testimony given in his earlier deposition.  In fact, in a passage not cited by Petitioner, McIntosh stated that when he met with the prosecutor just prior to his testimony, she simply reminded him that he was obligated to testify accurately and truthfully, and that if his testimony indicated he was lying either at trial or in his sworn deposition, he could be prosecuted for perjury.  (*Id.* at 28-29.)

The facts in this case are similar to those in *Riskin*, where the court found that no due process violation occurred because the prosecutor's remarks merely warned the witness of the dangers of perjuring himself by testifying inaccurately and in contravention of earlier sworn testimony.  788 F.2d at 1371.  McIntosh does not allege that the prosecutor intimidated him into not testifying or threatened to punish him if he testified truthfully.  Moreover, McIntosh's 1993 deposition testimony is not substantially different than what he stated in his 1981 deposition, and Petitioner does not assert that McIntosh's testimony was the only

source of evidence regarding Petitioner's drug and alcohol use. Under these circumstances, the PCR court's conclusion that no due process violation resulted from the prosecutor's conduct was not contrary to or an unreasonable application of Supreme Court precedent.

Evidentiary Development

Petitioner "seeks an evidentiary hearing . . . so that he may be allowed to obtain and present testimony from McIntosh, including testimony about the extent of the coercive pressure from the County Attorney that he felt at the time he testified at [Petitioner's] trial." (Dkt. 108 at 23.)

For the reasons discussed in addressing the merits of this claim, regardless of the question of due diligence in seeking an evidentiary hearing or further evidentiary development in state court, Petitioner has not alleged facts which if proved, would entitle him to relief. *See Townsend*, 372 U.S. at 312-13. As already noted, the county attorney's discussions with McIntosh prior to his trial testimony, as evidenced by McIntosh's characterization of these discussions in his 1993 affidavit and deposition testimony, do not support a finding of a constitutional violation.

**Claim 6 - Petitioner's Due Process Rights Were Violated When the State Presented False Testimony by Daniel Mcintosh**

Petitioner alleges that his due process rights were violated when McIntosh testified that he received no deal in exchange for his testimony and the prosecutor characterized McIntosh's testimony as voluntary. (Dkt. 108 at 24-25; *see* RT 9/22/82 at 496; RT 10/4/82 at 1224.) Petitioner contends that because McIntosh was told he had to testify consistently with his previous deposition testimony under threat of perjury charges, his testimony at trial was not voluntary. (Dkt. 108 at 24.) According to Petitioner, the prosecutor's characterization was false and Petitioner "did not learn about the misrepresentation of the voluntariness of McIntosh's testimony until after McIntosh had given a deposition in 1993." (*Id.* at 25.)

The state court rejected this claim in its order denying Petitioner's 1995 PCR petition:

Assuming the statements in [McIntosh's 1993] deposition are true, Petitioner has failed to present a colorable claim. He has not demonstrated

how the prosecutor **knowingly** used false testimony or **misrepresented** the voluntariness of McIntosh's testimony.  Nothing in McIntosh's deposition indicated that he had any "agreement" with the state.  A threat of perjury hardly constitutes an agreement. Anyone who lies under oath about a material fact can be prosecuted for perjury.  McIntosh never says the state was attempting to get him to make statements under oath that were not true.

There is no indication McIntosh had a "deal" with the state "to testify," or that he did not testify voluntarily.  Most importantly, there is no evidence that he testified about the murder in a manner other than the way it was related to him by the defendant.

Because there is no indication [the prosecutor] was aware that McIntosh testified to anything but the truth at trial, she did not knowingly use false testimony or misrepresent the voluntariness of the witness' testimony. Therefore, her actions and statements to the jury could not be a violation of due process and do not require a new trial.

(Dkt. 133, Ex. A at 21-22.)

Analysis

As discussed in Claim 2, due process is violated and a new trial is required if "false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue*, 360 U.S. at 271.  The predicate to a constitutional violation is deception or false testimony.

Petitioner has not presented evidence that either McIntosh or the prosecutor falsely denied the existence of a deal.  As noted by the trial court, no evidence of any deal has been presented.  Petitioner asserts that McIntosh's 1993 deposition shows that his denials of a deal, backed up by the prosecutor, were false.  Petitioner does not indicate what specific passages in that deposition support this conclusion.  The Court has reviewed that document and agrees with the state court that no evidence of a "deal" for McIntosh's testimony is suggested therein.  Again, merely reminding a witness of his duty to testify truthfully is not improper and does not rise to the level of a due process violation. *See Riskin*, 788 F.2d at 1370-71.  The trial court's rejection of this claim was not contrary to or an unreasonable application of Supreme Court precedent, nor was it based on an unreasonable determination of the facts.

Evidentiary Development

Petitioner seeks an evidentiary hearing on this claim "so that he may be allowed to obtain and present testimony from McIntosh, including testimony about the extent of the coercive pressure from the County Attorney that he felt at the time he testified at [Petitioner's] trial." (Dkt. 108 at 24.) This request is denied. There is no evidence supporting Petitioner's conclusory allegation that a deal existed between McIntosh and the prosecutor. *See United States v. Zuno-Acre*, 209 F.3d 1095, 1103 (9th Cir. 2000) (speculation is not a basis for an evidentiary hearing); *Daniels v. United States*, 54 F.3d 290, 293 (7th Cir. 1995) ("A hearing is not necessary if the petitioner makes conclusory or speculative allegations rather than specific factual allegations."); *Bashor*, 730 F.2d at 1233-34 (hearing not required when claim must be resolved on state court record or claim is based on non-specific conclusory allegations).

**Claim 8 - Petitioner's Right Against Self-incrimination Was Denied When the Police Ignored His Request for an Attorney and Continued Their Interrogation**

Petitioner contends that his federal constitutional rights were violated when, after being taken into custody, police continued to question him despite his invocation of his right to counsel. (Dkt. 108 at 26.) According to Petitioner, he invoked his right to counsel multiple times during police questioning but the questioning did not cease and eventually he made an inculpatory statement which led to discovery of incriminating evidence. (*Id.*)

Background

Following his arrest and after being informed of the charges and his rights, Petitioner was interrogated by the police. During this interview, Petitioner told the police that he knew the location of the victim's body; subsequently, he directed officers to the mine shaft on his parents' property. Prior to trial, Petitioner argued that the statements he made to police were the result of questioning conducted after he invoked his right to counsel and that his statements and any evidence flowing therefrom should be suppressed.

The trial court held a voluntariness hearing, at which the State presented testimony from the two officers involved in the interrogation, Detective Russ Davis and Lieutenant

1    Michael Midcalf.  Detective Davis testified that he was assigned as primary investigator on
2    November 19, 1981, and that he interviewed Petitioner that morning in an interrogation room
3    at police headquarters.  (RT 9/3/82 at 4-5.)  He interviewed Petitioner alone, with the door
4    closed.  (*Id*. at 5.)  He read Petitioner his *Miranda* rights at the start of the interview.
5    Petitioner said he understood his rights, did not appear to be under the influence of drugs or
6    alcohol, and was informed that he was charged with first degree murder.  (*Id*. at 6-7.)  Davis
7    did not promise, force, or threaten Petitioner into giving a statement. (*Id.* at 7-8.)  He did not
8    tape the interview but took notes.  (*Id.*)

9        Approximately nineteen minutes into the interview, Petitioner asked Davis what
10   would happen to him on the murder charge and Davis told him it was up to the court. (*Id.* at
11   9-10.)  Petitioner asked what would happen if he was found guilty, and Davis again told him
12   that would be up to the court.  (*Id.* at 10.)  At that point, Petitioner requested counsel.  (*Id.*)
13   Davis responded by telling Petitioner that he "was only trying to get the facts of the case and
14   giving him an opportunity to tell his side of it too, and if he wanted an attorney it was up to
15   him.  I asked him again if he wanted an attorney."  (*Id*.)  Petitioner hesitated and said he
16   didn't believe he needed one, but then stopped and said he did need one.  (*Id*.)  Davis
17   immediately terminated the interview.  (*Id*.)

18       As Davis opened the door to leave the interview room, Lieutenant Midcalf (who was
19   standing at the door) asked Davis if Petitioner had told him the location of the body.  (*Id.* at
20   11.)  Midcalf was looking only at Davis and spoke in a "slightly lower tone."  (*Id*. at 12.)
21   Davis told Midcalf that Petitioner had requested a lawyer.  At that moment, Petitioner, from
22   his position behind them, stated that he would take them to the body.  (*Id*. at 12-13.)  Davis
23   characterized Petitioner's statement as "spontaneous."  (*Id*. at 13.)  At that point, Davis
24   stated, "[w]e started preparing then for [Petitioner] to show us [where the body was]."  (*Id*.)
25   Petitioner told them the murder site was 100 miles outside Phoenix.  (*Id*.)  Davis
26   accompanied Petitioner to the location, and neither he nor anyone else asked Petitioner
27   questions.  During the trip Petitioner never balked at showing them how to find the body and
     did not repeat his request for an attorney.  (*Id*. at 14-15.)

Lieutenant Midcalf testified that he was assigned to supervise a possible homicide involving Juan Maya and that he was present during a portion of an interrogation conducted by Detective Davis.  (RT 8/27/82 at 41.)  Midcalf was not present during Davis's actual interview of Petitioner, but immediately upon its completion he opened the door to the interrogation room and asked Davis if Petitioner "is going to show us where the body is?"  (*Id.* at 44.)  Before Davis could respond, Petitioner, who was seated at a table in the room, interjected that he "would show you where the body is, I'll take you to the body, or words to that effect."  (*Id.*)  Midcalf stated that he then asked Petitioner where the body was.  (*Id.*)  At that point, Davis told Midcalf that Petitioner had asked for an attorney.  (*Id.*)

Midcalf further testified that he did not intend to question Petitioner or obtain any incriminating statements from him.  His "sole purpose . . . was to find out if [Petitioner] was going to show us where the body is."  (*Id.* at 45.)  According to Midcalf's testimony, he believed that Petitioner was "volunteering" to show them where the body was located.  (*Id.*)  Midcalf reiterated that he asked no questions of Petitioner after Davis informed him of Petitioner's request for an attorney.  (*Id.* at 47.)

Petitioner did not testify at the voluntariness hearing but called three witnesses.  Detective Bill Butler transported Petitioner back from Salome on the afternoon of November 19, 1981.  (RT  8/27/81 at 72.)  He testified that they engaged in small talk during the ride and spoke about nothing related to the murder or any other charges.  (*Id.* at 72-73.)  Detective Bob Brunansky testified that he first had contact with Petitioner at Petitioner's trailer on November 18, 1981.  (RT 8/27/81 at 76.)  Brunansky stated that Petitioner, who was not in custody at that time, answered questions concerning his relationship with Libberton, whether either he or Libberton knew Juan Maya, and when they first saw Maya with his car.  (*Id.* at 77.)  Brunansky stated that he did not talk to Petitioner after that and did not hear any further conversation or interrogation of Petitioner.  (*Id.* at 77-78.)  Finally, Detective David Owen testified that he was with Brunansky during the November 18, 1981 interview with Petitioner at his trailer.  (RT 8/27/82 at 80.)  Owen essentially corroborated Brunansky's testimony concerning the nature of the exchange.  (*Id.* at 80-81.)  He too stated that he did not talk to

Petitioner after that contact, nor did he hear or know of any subsequent interviews with Petitioner.  (*Id.* at 81-82.)

After considering this testimony, the trial court denied the motion to suppress, "finding that the defendant knowingly, willingly and voluntarily made his statements; that there was no threats or promises or force used to induce the statements."  (ROA 270 (ME 9/7/82).)[9]  On direct appeal, the Arizona Supreme Court agreed:

> At the nineteen-minute mark of the interview, James asked what would happen to him to which Davis responded "it's up to the courts."  James then asked for an attorney.  Instead of ceasing the interrogation, Davis told James he only wanted the facts and to give James an opportunity to tell his side of the story.  James hesitated, said he did not need an attorney, then changed his mind and asked a second time for an attorney.  Because James said nothing, he was not harmed.

> When James asked for an attorney the second time, Davis, who was seated across from James, rose, turned, walked to the door and opened it.  At that moment, Detective Midkiff [sic] arrived at the door.  Midkiff faced Davis and asked: "Did he tell you where the body is?"  There were two simultaneous responses: Davis said that James asked for counsel; James volunteered that he would tell them where the body was located.  James claims that his statement should have been suppressed and the fruits of that statement, the body, should have been suppressed also.

> Incriminating statements are not admissible unless *Miranda* warnings are administered.  If *Miranda* warnings were administered, the next requirement for admissibility is voluntariness.  Because James asked for an attorney before he made his statement, *Edwards* [*v. Arizona*, 451 U.S. 477 (1981)], and its progeny are controlling. . . .

> . . . .

> Both detectives testified that Midkiff's question was directed to Davis.  Both testified that Midkiff faced Davis and asked the question in a normal tone of voice.  Both detectives testified that no threats, promises or force were used to induce the statements.  James did not testify at the voluntariness hearing.

> The judge who presided over the voluntariness hearing said that James "knowingly, willingly, and voluntarily made" the statement and there were no threats, promises or force used to induce the statement.  The judge did not explicitly state that Midkiff's question to Davis was not interrogation as defined in *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682 (1980), nor did he explicitly state in the order that James waived his right to counsel; however,

---

[9]     "ROA" refers to Record on Appeal; "ME" refers to Minute Entry.  On December 27, 2000, the Maricopa County Superior Court provided to this Court seventeen volumes of records in Case No. CR-123711.  (*See* Dkt. 12.)  The trial court's minute entries are grouped together in Volumes 16 and 17 of these records.

we find that both are implicit in his findings based on the record.

> There was uncontradicted testimony that James understood his rights. There was uncontradicted testimony that Midkiff's question was meant solely for Davis. Although the court did not employ all of the proper "buzz words," the record indicates that James made a decision to cooperate with the police without benefit of counsel, and that his statement fits either definition of "initiate" in [*Oregon v. Bradshaw*, 462 U.S. 1039 (1983)]. The judge's ruling indicates that the police did not coerce James' statements, rather James, who knew his rights and how to exercise them, decided to cooperate. We hold that his statement was not obtained in violation of any of James' constitutional rights, as he initiated the communication and the judge implicitly found that James knowingly and intelligently waived his right to counsel.

> . . . .

> In sum, the motion to suppress the statements was properly denied. It follows that the evidence found as a result of the statements was admissible.

*James*, 141 Ariz. at 144-46, 685 P.2d at 1296-98.

Analysis

It is not disputed that Petitioner received his *Miranda* advisory prior to questioning. Once an accused requests counsel, he may not be interrogated unless counsel has been provided or the accused initiates further discussion. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). In *Oregon v. Bradshaw*, a plurality of the Supreme Court articulated a two-step process for determining the admissibility of statements made by an accused after he requests counsel. 462 U.S. 1039, 1044 (1983). First, the court must determine if the statement was initiated by the accused. *Id.* This means more than simply initiating a statement incident to his custody generally (such as a request for water or to use the telephone); rather, the accused must evince a willingness and a desire "for a generalized discussion about the investigation." *Id.* at 1045-46. If the accused initiates such a discussion, this satisfies the issue of voluntariness. *See id.* at 1044. However, this does not end the analysis. The accused must also have waived his right to counsel. *Id.* at 1045. This determination is made by examining whether, considering the totality of the circumstances, the accused knowingly and intelligently waived his right to counsel. *Id.* at 1046 (citing *Edwards*, 451 U.S. at 486 n.9).

The determination of the Arizona Supreme Court was neither contrary to nor an unreasonable application of the principles outlined in *Edwards* and its progeny. Based on

the testimony presented at the voluntariness hearing, the state courts reasonably found that Petitioner initiated further discussions about the case by telling the officers he would take them to Maya's body. The evidence supports the conclusion that he made this statement without prompting. The uncontradicted evidence showed that Lieutenant Midcalf was talking to Detective Davis, not Petitioner, when he asked if Petitioner was going to tell them the location of the body. In addition, evidence was presented at the hearing that Petitioner knowingly and intelligently waived his right to counsel. He had been Mirandized more than once, had told officers that he understood his rights, and was not promised anything for his statement, let alone coerced or forced into making the statement.

In sum, the Arizona Supreme Court's determination that Petitioner's statements were not in violation of the standards enunciated in *Edwards* and *Bradshaw* was not contrary to or an unreasonable application of those precedents. Nor were the courts' conclusions based upon an unreasonable determination of the facts in light of the evidence presented at the voluntariness hearing. *See* 28 U.S.C. § 2254(e)(1) (state court's factual determinations are presumed correct and habeas petitioner has the burden of rebutting that presumption by clear and convincing evidence).

**IV.    Ineffective Assistance of Counsel Claims**

Petitioner presented his ineffectiveness claims in his first PCR petition in November 1984. (Dkt. 27, Ex. B.) The court denied the petition on procedural grounds, finding the claims precluded pursuant to Rule 32.2(a)(3) of the Arizona Rules of Criminal Procedure. In a previous order, this Court determined that the state court's bar was inadequate to bar consideration of the claims on the merits. (*See* Dkt. 79.) Because the state courts did not pass on the merits of these claims, this Court's review is de novo. *Pirtle*, 313 F.3d at 1167; *see also Menendez*, 422 F.3d at 1025-26; *Nulph*, 333 F.3d at 1056-57.

To prevail on a claim of ineffective assistance of counsel ("IAC"), a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The inquiry under *Strickland* is highly deferential, and "every effort [must] be made to eliminate the distorting

effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  To prove deficient performance, a defendant must also overcome "the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*  To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"; "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Hayes v. Woodford*, 301 F.3d 1054, 1066 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 691).  To determine whether the investigation was reasonable, the court "must conduct an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (citation and quotation marks omitted).  As the Supreme Court recently reiterated, "In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made and by giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689, 691).

The right to effective assistance of counsel applies not just to the guilt phase, but "with equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d 1373, 1378 (9th Cir. 1995)).  With respect to prejudice at sentencing, the *Strickland* Court explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance

of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.  In *Wiggins*, the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.  The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced in the habeas proceeding." *Id.* at 536 (quoting *Williams*, 529 U.S. at 397-98).

A court need not address both components of the *Strickland* inquiry, or follow any particular order.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, without evaluating counsel's performance, that should be done. *Strickland*, 466 U.S. at 697.

### Claim 10 - Counsel Failed to Investigate and Present the Defense That Petitioner's Ability to Form the Intent for First Degree Murder Was Impaired by Substance Abuse

Petitioner was represented at trial by Terry H. Pillinger, whose firm Petitioner's parents retained for his defense.  (ROA 64; Dkt. 111, Ex. 33 at 11.)  Petitioner alleges that Pillinger was ineffective at trial for not presenting a voluntary intoxication defense.  (Dkt. 108 at 30-38.)  Petitioner contends that evidence, including testimony from Martin Norton and Daniel McIntosh, showed that he was intoxicated from smoking pot and drinking alcohol on the evening of Maya's murder.  (*Id.*)  He further contends that had counsel pursued a voluntary intoxication defense, the trial court would have been required to instruct the jury on second degree murder.  (*Id.* at 37-38.)

<u>Analysis</u>

Petitioner was charged on two theories of first degree murder:  premeditated murder and felony murder.  (RT 10/4/82 at 1276-77.)  Under Arizona law, there are no lesser-included homicide offenses for felony murder. *State v. Lopez*, 163 Ariz. 108, 112, 786 P.2d 959, 963 (1990) (citing *State v. Celaya*, 135 Ariz. 248, 255, 660 P.2d 849, 856 (1983)). Thus, with respect to the felony murder charge, Petitioner's assertion that a voluntary intoxication defense would have required the trial court to instruct on second degree murder as a lesser-included offense necessarily fails.

Second degree murder is a lesser-included offense of premeditated first degree murder and is distinguished from the latter only by the element of premeditation. *See State v. Marvin*, 124 Ariz. 555, 557, 606 P.2d 406, 408 (1980); *Vickers v. Ricketts*, 798 F.2d 369, 371 (9th Cir. 1986). "Premeditation" means that a person acts with either "the intention or the knowledge" that he or she will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. A.R.S. § 13-1101(1). In this case, the prosecution urged both mental states and the jury was instructed that to convict Petitioner of premeditated first degree murder, they must find that:

1.    The defendant caused the death of another person; and,

2.    The defendant *intended or knew* that he would cause the death of another person; and

3.    The defendant acted with premeditation.

Premeditation means that the defendant's *intention or knowledge* existed before the killing long enough to permit reflection. However, the time for reflection must be longer than the time required merely to form the *intent or knowledge* that conduct will cause death.

(RT 10/4/82 at 1276.) (Emphasis added.)

At the time of Petitioner's trial, A.R.S. § 13-503 provided that a jury could consider voluntary intoxication in determining culpable mental state only when the state of "intentionally or with the intent to" was a necessary element of the offense. However, when both the "knowing" and "intentional" aspects of premeditation are charged, voluntary intoxication is not a viable defense. *State v. Schurz*, 176 Ariz. 46, 55, 859 P.2d 156, 165 (1993) (jury may consider voluntary intoxication under A.R.S. § 13-503 only when intent is alleged and knowing is not alleged); *State v. Neal*, 143 Ariz. 93, 98, 692 P.2d 272, 277 (1984) ("first degree murder requires an 'intentional' or 'knowing' mens rea on the part of the assailant and voluntary intoxication only negates the 'intentional' mens rea"); *State v. Ramos*, 133 Ariz. 4, 5, 648 P.2d 119, 120 (1982).

Here, the jury was instructed on both the "intentional" and "knowing" mental states for premeditated murder; thus, Petitioner would not have been entitled to a voluntary intoxication defense and evidence of voluntary intoxication would not have been admissible

to negate premeditation (and establish second degree murder).  Petitioner cannot establish that Pillinger's failure to raise a non-viable defense constituted either deficient performance or prejudice.  Therefore, Petitioner is not entitled to federal habeas relief on this claim. Because Petitioner has not alleged facts which, if proved, would entitled him to relief, his request for further evidentiary development will be denied.  *See Townsend*, 372 U.S. at 312-13.

### Claim 12 - Counsel Denied Petitioner's Right to Testify at Trial about His Drug Use at the Time of the Incident

Petitioner complains that Pillinger erroneously advised him against testifying about his drug use because such evidence would have supported a defense that he lacked the requisite culpable mental state for murder.  (Dkt. 108 at 40.)  As just discussed, however, at the time of Petitioner's trial, voluntary intoxication was not a recognized defense to premeditated murder when, as here, both the "intentional" and "knowing" mental states are alleged.  Thus, counsel's representation was neither deficient nor prejudicial.  Further evidentiary development on this issue is denied.

### Claim 15 - IAC at Sentencing

Petitioner alleges that Pillinger's representation at sentencing was constitutionally ineffective because he failed to fully investigate and present available mitigating evidence. Specifically, Petitioner faults counsel's failure to interview witnesses familiar with his life history, develop information about the effect of drugs and alcohol on his state of mind at the time of the crime, and investigate and present evidence of his mental state, including a suicidal disposition.  (Dkt. 108 at 44-87.)

Background

Prior to trial, Drs. Maier Tuchler and Morton Berger were appointed pursuant to Rule 11 of the Arizona Rules of Criminal Procedure to determine whether Petitioner was competent for trial and to assess his mental condition at the time of the crime.  (ROA 48 (ME 3/16/82).)  To assist their evaluations, both psychiatrists were permitted access to Petitioner's

jail medical records[10] and the police investigative reports, and both met with Petitioner at the jail. (*Id.*) Petitioner relayed to Dr. Berger that he saw a psychiatrist twice while going through a divorce. (Dkt. 113, Ex. 52 at 1.) He also claimed to have attempted suicide at least five or six times "with either a razor blade or a knife and more recently toward the end of his divorce he smashed up his car going 120 m.p.h." (*Id.*) Dr. Berger concluded that Petitioner likely had no background of severe mental illness and was competent to stand trial. (*Id.* at 2.) Regarding the offense, Dr. Berger could not offer an opinion as to Petitioner's likely mental state because Petitioner was reluctant to discuss it. (*Id.*)

Dr. Tuchler's March 1982 report states that Petitioner reported a "disturbed childhood," a difficult relationship with his adoptive father, and an increased dependence on alcohol and drugs before the age of sixteen, including marijuana and LSD. (Dkt. 109, Ex. 17 at 1-2.) Petitioner described his suicide attempts, including slashing his wrists while in jail, and Dr. Tuchler observed evidence of a typical suicidal gesture on Petitioner's wrist. (*Id.* at 2.) Petitioner further stated that he married in 1980, but the marriage lasted less than a year "because [his wife] thought he was crazy in view of his dependence on drugs." (*Id.*) Regarding the offense, Petitioner told Dr. Tuchler, "They said I killed somebody . . . but I sat outside in the car." (*Id.*) He further stated that Norton was picked up by a homosexual, that the homosexual tried to molest Norton, and that he was "tripping" on LSD at the time. (*Id.*) Dr. Tuchler described Petitioner as "extremely evasive" regarding the crime and said Petitioner did not wish to discuss the incident in detail. (*Id.* at 3.)

Dr. Tuchler concluded that Petitioner was competent for trial. "He gives no evidence or history of disorders of thought, he is devoid of history of hallucinatory or delusionary disturbance." (*Id.* at 3.) With respect to the offense, Dr. Tuchler found no evidence of any significant mental disease or alteration of Petitioner's mental state. (*Id.* at 4.) "Although the subject claims he was 'tripping' on LSD, his statements and police record reveal no significant disorders of perception." (*Id.*)

---

[10]    Although the court directed that the jail records be made available, it appears that neither expert actually reviewed them.

In August 1982, five months after the Rule 11 examinations, defense counsel Pillinger moved for appointment of a new psychiatric expert, Dr. Thomas O'Brien.  (ROA 235.)  The motion stated that the reports of Drs. Berger and Tuchler failed to address the question whether Petitioner "was suffering from such a mental disease or defect as not to know the nature and quality of the act, or, if such person did know, that such person did not know that what he was doing was wrong."  (*Id.* at 2.)  The motion further asserted that the experts' interviews with Petitioner were not extensive and that no factors beyond the police reports were considered.  (*Id.* at 2-3.)  Finally, the motion identified two "new facts" for which further psychiatric evaluation was necessary:  Petitioner had experienced extensive auditory and visual hallucinations before and after the offense, and he was "possessed by a demonic spirit at the time of the incident and may still be possessed by a demonic spirit."  (*Id.* at 3.)  The court denied the motion, but stated it would consider a motion to have Drs. Berger or Tuchler conduct an additional examination of Petitioner.  (ROA 234 (ME 8/11/82).)  It does not appear from the record that Pillinger ever filed such a request.[11]

Several days after Petitioner's convictions on October 4, 1982, Pillinger filed a "Memorandum of Law Re: Mitigation Hearing."  (ROA 393.)  The memo, two-and-a-half pages in length, summarily listed the following mitigating factors:  Petitioner's age at the time of the crime (twenty-four), the fact that Norton testified to inflicting the final blow, duress, intoxication, the fact that Petitioner had been a model probationer, and reasonable doubt as to Petitioner's role in the killing.  (*Id.* at 3-4.)

Pillinger also filed a motion for new trial, which was supplemented two weeks later after he was contacted by Dr. Jack Potts, one of Petitioner's treating psychiatrists at the jail.  (ROA 395; ROA 409.)  The supplemental motion asserted that Dr. Potts commenced treatment of Petitioner with Lithium in March 1982, that the treatment was ongoing, and that Dr. Potts had compiled a psychiatric evaluation of Petitioner.  (ROA 409 at 2.)  The motion

---

[11]     Dr. O'Brien was ultimately appointed in the case but only for the purpose of assisting counsel in evaluating Martin Norton's psychological records and credibility.  (RT 9/28/82 at 877, 1000-01; ROA 365 (ME 9/28/82).)

further stated that Pillinger had spoken to Jerry Ott, a classification counselor for the county jail, who relayed that Petitioner was considered to be mentally unstable by jail personnel. (*Id.*)  Based on this new evidence, Pillinger argued that the administration of Lithium had affected Petitioner's psychological disposition, which likely impacted the Rule 11 competency evaluations conducted by Drs. Tuchler and Berger.  (*Id.* at 3.)  Counsel also subpoenaed the jail's records on Petitioner.

> *Aggravation/Mitigation Hearing*

The aggravation/mitigation hearing was originally slated to begin on October 28, 1982.  Because the probation department's presentence report was not yet available, the court instead convened a hearing on Petitioner's motion for new trial at which defense counsel called Dr. Potts to testify regarding Petitioner's mental state while in jail pending trial.  (RT 10/28/82 at 1299.)  However, because neither counsel nor the prosecutor had received the jail's medical records prior to the hearing, it became apparent that a postponement was necessary.  (*Id.* at 1307-08.)  Consequently, the court held a combined hearing on November 2, 1982, to consider evidence offered in support of the motion for new trial as well as aggravation and mitigation for sentencing.  (RT 11/2/82 at 1337.)

At the hearing, Pillinger called the following witnesses: Jerry Ott, the jail counselor; Drs. Tuchler and Potts; Dennis Watterson, Petitioner's probation officer following a burglary conviction in 1977; and Winnie James, Petitioner's adoptive mother.  He also proffered numerous jail records that listed Petitioner as a "high suicide risk" who was susceptible to mood swings and problems controlling his anger.  (Dkt. 114, Exs. 61-63.)  The records revealed that Petitioner had attempted to commit suicide by slitting his wrist on one occasion and swallowing twenty-four aspirin on another.  (*Id.*, Exs. 61, 64.)   The records also documented ongoing psychiatric treatment by numerous psychiatrists since Petitioner's incarceration in the jail in November 1981.  (*Id.*, Exs. 61, 63, 65.)

Ott testified that he came into contact with Petitioner in March 1982.  He stated that Petitioner initially was classified as a "918" inmate, indicating one who is emotionally disturbed or combative.  (RT 11/2/82 at 1340-41; *see also* RT 10/28/82 at 1313.)  Ott noted

that Petitioner was considered a high suicide risk when first arrested but that he calmed down after being put on Lithium. (RT 11/2/82 at 1341.)  He also testified that Petitioner described a dead fantasy friend named Mike to whom Petitioner attributed certain personality characteristics.  (*Id.* at 1340.)  In response to Pillinger's questioning, Ott agreed that Petitioner could be rehabilitated. (*Id.* at 1343.)  He further stated that Petitioner spoke to him briefly about his past use of cocaine, alcohol, and, to a lesser extent, LSD, but that he and Petitioner did not discuss the crime itself or whether Petitioner had taken any drugs on the night of the offense.  (*Id.* at 1344-45.)

On cross-examination, Ott testified that part of Petitioner's counseling in jail concerned "anger control." (*Id.* at 1347.)  He stated that Petitioner told him he had a history of "anger outbursts" and described how killing animals while employed at a slaughterhouse had helped control it.  (*Id*. at 1347-48.)  Petitioner told Ott that he felt anger toward his adoptive father but avoided showing these feelings.  (*Id.* at 1348.)  Ott also noted that Petitioner had a pattern of playing the victim and seemed to blame others, such as his parents and police, for his problems rather than accepting responsibility. (*Id.* at 1349.)  Ott did not believe Petitioner had a fantasy friend but that he had instead used the character "Mike" as a vehicle to describe his own feelings early in their counseling relationship.  (*Id.*)

Pillinger's examination of Dr. Tuchler focused on two areas: the impact of previously-unreviewed medical records on Dr. Tuchler's pretrial examination of Petitioner and the impact of LSD and PCP on Petitioner's behavior at the time of the offense.  Dr. Tuchler testified that the records revealed that Petitioner had been treated with various medications throughout his incarceration in the county jail.  (*Id.* at 1356.)  These included, at differing times, Tofranil (an antidepressant), Mellaril and Librium (tranquilizers), and Lithium. (*Id.*)  Petitioner was also variously prescribed Motrin, Napricin, Parafon, and Tylenol with Codeine to alleviate joint pain.  (*Id.* at 1356-57.)  He further testified that while Tylenol with Codeine could affect a person's mental acuity, Lithium has no such effect.  (*Id.* at 1362.)  On cross-examination, Dr. Tuchler testified that this information would have been helpful to have but, overall, did not affect his forensic evaluation.  (*Id.* at 1376.)

With regard to recreational drug use, Petitioner told Dr. Tuchler that he had a long history of using LSD, PCP, and marijuana and that, on the night of the offense, he had taken PCP and was "tripping" on LSD. (*Id.* at 1365.) Dr. Tuchler testified that he believed Petitioner was being truthful and that these mind-altering drugs may have affected his motivation, intent, and capacity to appreciate the consequences of his acts. (*Id.* at 1365-67.) On cross-examination, he stated that he could not actually determine whether these drugs altered Petitioner's mental state at the time of the offense because Petitioner had invoked his right not to incriminate himself and declined to discuss the crime. (*Id.* at 1371.) Dr. Tuchler also noted, presumably from his review of the police reports, that Petitioner had a good memory of what had occurred. (*Id.*) He further acknowledged that the jail's treating doctors found no signs of hallucinations or delusions, thought Petitioner was manipulative, and believed he embellished symptoms. (*Id.* at 1373.)

Dr. Potts was called as a witness by Pillinger solely to testify regarding the possible effects of the medications administered to Petitioner following his arrest; counsel expressly stated that he did not intend for the doctor to testify regarding any psychiatric diagnoses of Petitioner. (*Id.* at 1394.) Dr. Potts acknowledged prescribing Lithium for Petitioner and explained that, unlike tranquilizers or antipsychotic medication that could affect a person's behavior or presentation, Lithium "simply take[s] off the irritability." (*Id.* at 1380, 1385.) On cross-examination, the prosecution elicited from Dr. Potts that he had diagnosed Petitioner with Cyclothymic Disorder,[12] which he explained (in a 1995 affidavit prepared for Petitioner's PCR proceedings) is an attenuated form of manic-depressive illness. (*Id.* at 1395; Dkt. 113, Ex. 56 at 1.) Dr. Potts was not asked to describe the disorder or its symptoms other than to agree with the prosecutor that one of the diagnostic criteria is the absence of psychotic features such as delusions or incoherent associations. (*Id.* at 1395.)

---

[12] The court reporter transcribed Dr. Potts's testimony as "psycholothalmic" disorder; however, no such disorder exists in the Diagnostic and Statistical Manual of Mental Disorders, and Dr. Potts's later affidavit states that he diagnosed Petitioner with Cyclothymic Disorder.

Pillinger's examination of Dennis Watterson was brief and focused primarily on Petitioner's capacity for rehabilitation. Watterson supervised Petitioner for two years following his conviction, at age eighteen, for burglarizing his pastor's home. (*Id.* at 1399.) Petitioner told him that the burglary was an act of rebellion against his father, with whom he had difficulties. (*Id.* at 1400.) Watterson denied that Petitioner had been a "model" probationer but said he had made good progress and at that time was rehabilitatable. (*Id.* at 1401-02.) Watterson's last contact with Petitioner was in 1979, two years prior to Maya's murder. (*Id*. at 1403.)

Pillinger's examination of Petitioner's adoptive mother was equally brief. Winnie James testified that she and her husband adopted Petitioner when he was four years old. (*Id.* at 1405.) Petitioner had been in numerous foster homes and was old enough to understand that his birth mother had rejected him. (*Id.* at 1406.) Petitioner was on at least three medications at the time of the adoption, but Mrs. James could not recall what they were. (*Id.* at 1406-07.) Mrs. James also testified that Petitioner was not prone to rage or abnormal behavior, and never mistreated her physically or acted in a violent manner. (*Id*. at 1407-08.) She knew he drank beer but was not aware of any drug problem. (*Id.* at 1410.)

Arguments on the new trial motion and sentencing were held ten days after the hearing, on November 12, 1982. Pillinger emphasized two areas of mitigation. First, citing the testimony of Dr. Tuchler, counsel argued that the court should consider the fact that Petitioner was under the influence of alcohol and drugs at the time of the killing, which diminished his ability to distinguish between right and wrong. (RT 11/12/82 (2:12 p.m.) at 14-15, 21-22.) Second, counsel stated that Petitioner had previously been a good probationer and was rehabilitatable. (*Id.* at 15-16.) The entirety of Pillinger's mitigation argument and rebuttal argument amounts to a little over two transcript pages. (*Id.* at 14-16, 21-22.)

*Presentence Report*

Just prior to the November 2 hearing, the trial court and counsel received a presentence report (PSR) prepared by the court's probation department (*Id.* at 1338). *See* A.R.S. § 13-703(C) (1978) (repealed by Laws 1999, Ch. 104, § 1). The PSR included a

statement from Petitioner arguing that the murder charge was not justified.  (Dkt. 110, Ex. 28 at 2.)  Petitioner claimed he hit Maya only once in self defense and that he had tried to stop Maya from being killed but could not persuade Libberton and Norton to release the victim.  (*Id.*)  Petitioner said his only culpability was driving the car to the murder site and dragging Maya's body to the mine shaft, both of which he was forced to do by the others. (*Id.*)  He claimed not to be a violent person and said he would have helped Maya if Maya had "tried to help himself."  (*Id.*)  Petitioner attributed his actions to drug use and depression; he claimed he had not been fully aware of events because he was under the influence of LSD and was severely depressed because his girlfriend had recently left him.  (*Id.*)  He further said he was very remorseful but reiterated that he was only an accessory and was not responsible for the murder.  (*Id.*)

The PSR provided the following social history, drawn primarily from Petitioner's statements to the report writer:

> The defendant was born May 24, 1958, in Los Angeles, California, one of several children born to Laura Wallace and Les Pinal.  He stated that, according to his natural mother, his natural father was a drug addict and was sentenced to prison when the defendant was very young.  He related that his mother had too many children to support, consequently she gave custody of him and his sister to the state where they were placed up for adoption.  He claimed that he then spent approximately a year and a half in several different foster homes.  At the age of four and a half, he was adopted by Winnie and Bradley James and spent the remainder of his developmental years in their care.  He related that the James' were over fifty years of age at the time they adopted him and that he was their only child.  He related that they provided him a good, stable middle class home in which he always felt loved and protected.  The defendant stated that he has always felt rather depressed and unhappy, with feelings of inability to cope with pressure.  As a result of these feelings, he disclosed that he has attempted suicide approximately four times, primarily through deliberate car accidents.  He also relayed several events during the recent past which he believes are significant.  He stated that prior to this offense, he visited his natural mother for the first time, which he stated had a devastating effect on him.  He also related that his wife divorced him after only a few months of marriage and he had tried to kill himself in a car accident as a result of severe depression brought on by this incident.

(*Id.* at 8.)  The PSR also stated that Petitioner was a slow learner and had dropped out of school after the eleventh grade.  (*Id.*)  Petitioner's employment history was unstable and erratic.  (*Id.*)  He claimed to have used alcohol and drugs excessively, including LSD, PCP, heroin, and marijuana.  (*Id.*)  He married in January 1980 and, due to his drug use, divorced

a year later.  (*Id.*)

The PSR also included statements from Petitioner's mother and father.  Mrs. James stated that she loved Petitioner and recalled him being a "friendly boy" who cared for animals as a child and never displayed a propensity toward violent behavior.  (*Id.* at 4.)  She admitted Petitioner was somewhat difficult as an adolescent and always seemed to be "in the wrong place at the wrong time," but stated that she and her husband had visited Petitioner weekly since his incarceration and noted that he seemed to have matured and gained some insight.  (*Id.* at 5.)  Mr. James stated that Petitioner was not a violent person and attributed his involvement in the murder to fear of his accomplices, who were "an extremely negative influence" on his son.  (*Id.*)  He recounted that Petitioner was under stress at the time of the murder due to the fact that his wife had left him the previous year and that his most recent girlfriend had just left him.  (*Id.*)  He also related that Petitioner had visited his biological mother in California recently and the encounter had left him very upset.  (*Id.*)  He further stated that Petitioner was unemployed and had apparently been using drugs.  (*Id.*)

The PSR also included statements from Dennis Watterson, Petitioner's childhood friends Jim Stepp and Don Thorp, Jerry Ott, and defense counsel Pillinger.  Watterson stated that Petitioner struck him as an immature eighteen-year-old with low self-esteem, whose conduct (breaking into his minister's home and stealing fifteen dollars in currency) stemmed from adolescent rebellion toward a strict, extremely religious father.  (*Id.* at 4.)  Stepp characterized Petitioner as a non-violent "nice guy" and opined that Petitioner's involvement in the offense must have been due to irrationality brought on by excessive drug use.  (*Id.* at 5.)  Thorp recounted that Petitioner was always somewhat rebellious as a youth and refused to follow society's rules.  (*Id.* at 6.)  He noted that some people who knew Petitioner as he was growing up described him as "incorrigible," and he attributed Petitioner's problems to immaturity and drug use.  (*Id.*)  Thorp also stated his belief that Petitioner had "matured significantly," was prepared to take responsibility for his actions, and was rehabilitatable. (*Id.* at 5-6.)

Ott reported that Petitioner had problems adjusting to jail life. (*Id.* at 6.) He noted that Petitioner had "made two or three superficial suicidal gestures," which he attributed to frustration and anger. (*Id.*) Ott characterized Petitioner's jail behavior as "aggressive at times," but not disruptive enough to warrant assault charges. (*Id.*) Ott believed that Petitioner saw himself as impotent and weak and, as a result, suffered from low self-esteem and feelings of powerlessness. (*Id.*) He further believed that Petitioner was capable of being rehabilitated if he stayed drug free and participated in long-term intensive psychological treatment. (*Id.*)

Pillinger told the PSR author that Petitioner was using LSD and was under substantial duress from his co-defendants at the time of the murder. (*Id.* at 6.) He believed Petitioner was not the prime actor in the killing and pointed out that Martin Norton had inflicted the final death blow. (*Id.* at 6-7.) He also recounted that Petitioner had voluntarily cooperated and led police to the body. (*Id.*) In his view, Petitioner became involved in the offense due to his suicidal tendencies. (*Id.*)

The PSR concluded by noting:

> A review of the defendant's social history indicates that the defendant experienced disruptive and unstable circumstances until he was adopted by the James family at the age of four and a half. His acknowledged depressions and morosity in later years may be related to unresolved feelings of insecurity and/or anxiety as a result of early deprivation. He apparently received sufficient attention, love, and care from the James' from the age of five and they continued to be supportive of him. There is, however, some indication that he experienced an antagonistic relationship with his father during his adolescence and his prior criminal arrest was perceived as perhaps an unconscious attempt to defy his father and his beliefs. It seems noteworthy that, although, the defendant was twenty-three years old when the instant offense occurred, he was unemployed at the time and financially supported primarily by his parents. This may have contributed to feelings of inadequacy, powerlessness, anger, and depression. In this writer's opinion, feelings of this nature may compel an emotionally immature individual to try to prove their competence and control over situations to others as well as to themselves. It seems likely, in this writer's opinion, that the defendant's involvement in the instant offense may have been partially attributable to his need to control situations and act out repressed feelings of anger and hostility.

(*Id.* at 10.) The PSR author further stated that Petitioner's claims of having been coerced into participating in the murder were "questionable" and noted that the evidence at trial indicated it was Petitioner who chased the victim when he tried to flee the trailer, Petitioner's gun that

1    was used in the crime, Petitioner who drove the car to the murder site, and Petitioner who

2    dragged Maya's body to the mine shaft and threw it in.  (*Id.*)  The PSR also characterized

3    Petitioner's participation in the murder as "primary" and described the crime as "senseless,

4    unnecessary, and executed in a particularly cruel and depraved manner."  (*Id.* at 10-11.)

5    Finally, the report stated that, despite all this evidence, Petitioner failed to admit his

6    wrongdoing and  attempted to minimize his involvement.  (*Id.* at 11.)

7        *Sentencing*

8        Petitioner was sentenced to death on November 23, 1982.  In its special verdict, the

9    sentencing court found two aggravating factors: (1) that the murder was committed for

10   pecuniary gain, and (2) that it was committed in a heinous, cruel and depraved manner.  (RT

11   11/23/82 at 1453-54.)  Regarding the heinous, cruel and depraved aggravating factor, the

12   court found:

13           The Defendant DID commit the offense in an especially heinous, cruel,
14   or depraved manner.  The term "cruel" in this statute has been defined by our
     Supreme Court to refer to the pain and mental and physical distress visited
15   upon the victim.  The evidence unquestionably shows beyond doubt that the
     victim in this case suffered prolonged and excruciating mental, physical and
16   psychological pain and distress, and that such pain and distress were inflicted
     deliberately and sadistically.  Several hours passed between the time the
17   Defendant and his co-murderers formed the intent to kill the victim and the
     time that they did kill him.  During this time the victim was viciously beaten
18   all over his body, including his head, face and groin.  He was taunted and his
     murder was openly and blithely discussed in his presence.  Early in the
19   evening, he attempted to escape, and was caught by the Defendant and
     returned to the Defendant's home.  His repeated pleas to be released in return
20   for all his valuables were rejected.  He was robbed of all possessions he had
     with him.  He was held at gunpoint for hours.  He was kidnapped and spent
21   hours traveling to the scene of his death in his own automobile.  After finally
     arriving at the scene of his murder in a remote, isolated desert area, he was
22   shot, causing his clothing to catch on fire.  He was then viciously beaten with
     fists, boards and rocks until finally he expired.  The evidence shows that he
23   had been beaten beyond recognition prior to his death.  In short, the murder
     was committed in an especially cruel manner.

24           Arizona cases define the statutory terms, "heinous" and "depraved" as
     relating principally to the killer's state of mind.  First, this was a totally
25   senseless murder.  Even if the events of the evening began as the perpetrators
     now claim, there was no reason for the killing other than the perpetrators'
26   greed and their arrogation to themselves of the role of executioners to those
     whose sexual preferences they purport to decry.  The Defendant carried out
27   this murder in a depraved manner, indicating a total disregard of even minimal
     feelings of compassion for a fellow human being.  The manner in which the
     killing was accomplished has already been detailed.  Following the killing, the

Defendant bragged about his role in it and of the difficulty he and the others had in finally making Juan Maya die.  Defendant's statements evidence no compassion or remorse and indicate he felt he was justified in killing someone who he believed to be different than himself.  The mode of disposing of the body itself demonstrates a certain callousness and depravity and disregard for the victim's family who might never have learned of the fate of Juan Maya, but for the later brazenness of the Defendant and his co-murderers.  This Defendant did commit the murder in an especially heinous and depraved manner.

(RT 11/23/82 at 1455-57.)

As to mitigation, the court determined that Petitioner had failed to establish, under A.R.S. § 13-703(G)(1), that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired.  (*Id*. at 1457.) In rejecting this mitigating factor, the court noted that "[w]hile Defendant later made a self-serving statement that he had [taken] drugs that night of the murder, the evidence is clear that his capacity was not impaired."  (*Id*.)

The court also rejected duress, as set forth in A.R.S. § 13-703(G)(2), as a mitigating factor:

At trial Defendant claimed that he participated in this hours-long homicide because he was in fear of Libberton.  The evidence completely negates this claim.  Libberton was Defendant's self-adopted friend with whom he voluntarily continued to associate after the murder until their arrest.  Defendant himself prevented Juan Maya's escape early in the evening and by himself, returned him to Defendant's own house so the terror could continue.  It was Defendant's gun which was used.  Defendant suggested the site of the murder and disposal of the body, which was on distant property owned by Defendant's family.  The Defendant was the only one who even knew how to get there and was the one who drove all the others there.  When stopped by a policeman, en route, Defendant had ample opportunity to extricate himself from Libberton's "duress" but, instead, skillfully avoided doing so to enable the murder plan to proceed undetected and unimpeded.  He also could have "extricated" himself at the filling station where he bought cigarettes and gas and forged a check.  While Defendant claimed to be in great fear of his friend Libberton, his credible evidence of such fear is non-existent.  Defendant's testimony concerning "duress" is blatant perjury.

(RT 11/23/82 at 1457-58.)  The court further found that Petitioner "was one of the individuals who actually committed the offense," that he foresaw and intended that his conduct would cause Maya's death, and that his age was not a mitigating factor.  (*Id*. at 1458-59.)

On appeal, the Arizona Supreme Court determined that the pecuniary gain aggravating factor could not be established because the jury had acquitted Petitioner of robbery and theft. *See James*, 141 Ariz. at 146, 685 P.2d at 1298.  Nevertheless, the court upheld the death sentence, noting that the evidence supported the trial court's finding that the heinous, cruel or depraved factor was established and that mitigating factors were either not established or were not sufficiently substantial to warrant leniency. *Id.* at 148, 685 P.2d at 1300.  Like the trial judge, the Arizona Supreme Court concluded that Petitioner's claim of duress lacked credibility and that he was a willing participant in the murder.  With regard to Petitioner's purported use of LSD, the court stated that "evidence of drug ingestion was unrefuted but it was uncorroborated." *Id.*  The court further concluded from its review of the record that Petitioner's "capacity on the night of the crime was not impaired." *Id.*  Finally, the court found that Petitioner had failed to establish as mitigating factors that he felt genuine remorse and would be a model prisoner. *Id.*

Failure to Investigate Life History

Petitioner argues that counsel's failure to interview witnesses familiar with his life history left important mitigating evidence undeveloped. (Dkt. 108 at 44.)  In support of his allegations, he proffers numerous declarations, affidavits, and other documentary evidence. (*See* Dkts. 109-114.)

*Stepp, Thorp, and Jackson*

Petitioner asserts that had counsel interviewed Jim Stepp, Don Thorp, and Reverend Richard Jackson, he would have obtained valuable information relating to Petitioner's troubled childhood, struggles in school, prolonged drug abuse, and deteriorating mental health.[13]  (*Id.* at 47-48; *see also* Dkt. 110, Exs. 25-27.)  Specifically, they could have provided evidence that from the time of his adoption he was hyperactive, "on the edge," and

---

[13]    Thorp was an older cousin who taught at a Christian high school and occasionally counseled Petitioner during his teen years.  Stepp was a friend and schoolmate. Jackson was the James family pastor.  Petitioner indicates that each met him shortly after his adoption and "interact[ed] regularly with him over the years." (Dkt. 108 at 47.)

difficult to control.  (Dkt. 108 at 48.)  Petitioner did "silly things" in grade school to get attention and was frequently teased for being overweight.  (*Id.*)  His behavior worsened in high school, and he frequently cut classes and began using drugs.  (*Id.* at 49.)  Jim Stepp, in particular, could have testified that Petitioner was "really depressed" after his wife left him and was devastated and "deeply under the influence of drugs" when, a few months prior to the murder, he traveled to California and learned that his birth father was a felon and his birth mother had kept her other children and had engaged in prostitution.  (*Id.* at 49.)

Petitioner asserts that Pillinger failed to contact Stepp, Thorp or Jackson, even though all were willing and able to testify.  He notes that even the PSR author interviewed Stepp and Thorp and related "short, non-specific comments made by [them] relating to [Petitioner's] behavior growing up and to his drug use."  (*Id.* at 50.)  Petitioner further argues that interviewing these individuals would have "underscored to Pillinger the real need to look further into Mr. James's past, to investigate Mr. James's pre-adoption childhood, to examine his school records, to interview Mr. James's former wife, and to locate other persons who interacted with Mr. James during and after his trip to California to meet his biological family."  (*Id.* at 51.)

*Winnie James*

Petitioner contends that counsel's examination of Petitioner's mother during the mitigation hearing was woefully inadequate because it portrayed Petitioner as a person who had a routine childhood and no drug problems.  (*Id.* at 51-52.)  Petitioner argues that Pillinger failed to elicit from Mrs. James evidence of Petitioner's deeply troubled childhood, including the fact that he continually experienced "behavioral and learning problems throughout his school years; that he was married a year before the homicide, but the marriage failed because of drug abuse; that he went to California to meet his biological family a few months before the homicide; and that his emotional deterioration after returning to Arizona traumatized Mrs. James."  (*Id.* at 52.)  In several post-conviction interviews, Winnie James relayed that she and her husband adopted Petitioner after another couple had decided his behavioral problems were too difficult to handle; the other couple had put Petitioner on behavioral medication,

which was discontinued after the adoption because Mr. James was opposed to such drugs. (*Id.* at 53; *see also* Dkt. 111, Exs. 30-32.)  Petitioner was emotionally troubled from the start, wet his bed for several years, and was extremely afraid of being alone in the dark.  (Dkt. 108 at 53.)  He had a short attention span, would not do as he was told, engaged in mischief, and stole from his parents.  (*Id.*)  Petitioner was always a poor student and started using drugs in high school.  (*Id.* at 54.)  After his failed marriage, Petitioner became irritable, distracted, and unable to let things go.  (*Id.*)  He deteriorated further and was regularly intoxicated after returning from a visit with his biological family in the months preceding the homicide.  (*Id.*) Mrs. James further claimed that Terry Pillinger, whom she and her husband had hired to defend Petitioner, failed to meet with her prior to her testimony; consequently, she was unsure what to say and thought she needed to portray Petitioner in the best possible light. (*Id.* at 55.)

Following Winnie James's death in 2006, Petitioner's habeas counsel discovered that she had kept a diary, which recorded her reflections "during the turbulent year preceding the homicide and the year following it."  (*Id.* at 53; *see also* Dkt. 111, Ex. 33.)  The diary chronicles Petitioner's "life spinning out of control" and expresses Mrs. James's conflicted emotions concerning Petitioner.  (Dkt. 108 at 55.)  In December 1980, she writes about Petitioner's troubled marriage and the efforts she and her husband undertook to assist the couple, including paying off their truck and buying them a mobile home.  (Dkt, 111, Ex. 33 at 1.)  She observes that Petitioner "doesn't want anything from us but money" and contemplates changing phone numbers so as not to hear from him again.  (*Id.*)  In January 1981, Petitioner went to California with his biological sister to meet his birth family and returned with his half-brother; Petitioner retrieved a truck and his clothing and went back to California, only to return less than a week later on a motorcycle, broke, and claiming to have not eaten in days.  (*Id.* at 2.)  The Jameses gave him money to return to California, and Mrs. James again laments the need to make a break from Petitioner, whom they loved and "gave a good upbringing."  (*Id.*)  Petitioner returned to Arizona in February 1981, and his parents set him up in an apartment.  (*Id.* at 3.)  Between April and August 1981, Petitioner worked

as a shoe salesman and lived at his parents' home; during this time, he stayed out late most nights and on a couple of occasions woke his parents to tell them he hated them, especially his father.  (*Id.*)  In August 1981, Petitioner moved back into his mobile home, and Mrs. James writes of her frustration with Petitioner's lifestyle and his stealing from them; she wishes she "could hate him but can't."  (*Id.* at 5.)  A month before the homicide, after Petitioner and his girlfriend break into his parents' home to steal food, Mrs. James writes: "Our hearts are heavy, why oh why does he do this to us.  We have never wanted anything but the best for Steven."  (*Id.* at 6.)

Petitioner further argues that interviewing Winnie James before the mitigation hearing would have revealed that Petitioner maintained communication with his biological sister, biological mother, and ex-wife, each of whom Mrs. James knew how to contact.  (Dkt. 108 at 57-58.) Pillinger also would have learned that Mrs. James had gathered Petitioner's school records (as noted in her diary).  These records reveal that Petitioner received "C" and "D" grades in academic subjects throughout elementary school and that his marks in behavior, dependability, courtesy, care of property, and work habits were consistently unsatisfactory. (*Id.* at 58; Dkt. 111, Ex. 35.)

*Other Available Witnesses*

Petitioner argues that Pillinger failed to utilize other available witnesses to provide additional information about Petitioner's upbringing and failed marriage.  Kyle Cooper and Charles Beaulieu, elementary and junior high school friends and classmates, could have testified that Petitioner was overweight and picked on by other kids in school.  (Dkt. 108 at 59; Dkt. 111, Exs. 37-38.)  Next door neighbor Lauretta Pool, who had adopted Petitioner's sister, Donna, at the same time the James family adopted Petitioner, would have informed counsel that she knew Petitioner had experienced a "rough life in California" before his adoption.  (Dkt. 108 at 59; Dkt. 112, Ex. 39.)  Marna Kelley, Petitioner's ex-wife, would have told Pillinger that Petitioner was "seriously mentally ill," and experienced "instant and unpredictable mood swings," inexplicable "rages," and "hallucinations."  (Dkt. 108 at 59; Dkt. 112, Ex. 40.)

Petitioner argues that Pillinger was also on notice of potential mitigating evidence relating to his biological family.  Had counsel investigated, he would have learned that Petitioner's biological father was a high school dropout, drug addict, and felon, and that Petitioner's paternal uncles and half-brothers were also drug addicts.  (Dkt. 108 at 61; Dkt. 112, Exs. 41-45.)  Petitioner's birth mother was mentally unstable, lived on welfare, and frequently brought home abusive, alcoholic men.  (Dkt. 112, Ex. 45.)  Her mother, aunt, and maternal grandmother all suffered from some form of mental illness.  (*Id.*, Exs. 45, 47.)  Moreover, her brother was a sexual predator who frequently stayed at their home, including in the period before Petitioner's adoption.  (*Id.*, Exs. 45, 48-49.)  Petitioner's half-brother, Jerry Isgrigg, who suffers from mental problems and has been a homeless alcoholic for most of his adult life, recalls that this uncle molested him when he was seven or eight years old; however, he does not know when the molestation began and whether Petitioner was also a victim.  (*Id.*, Ex. 48 at 2.)  Petitioner has no recollection of this period in his life.  (Dkt. 108 at 64 n.30.)

Finally, Petitioner faults Pillinger for not investigating the impact of Petitioner's January 1981 trip to meet his biological family in California.  Petitioner was "shaken up" upon meeting his biological family and asked his mother why she "sold" him but kept other children.  (Dkt. 112, Ex. 45 at 2; *id.,* Ex. 48 at 2.)  After meeting, Petitioner and Isgrigg "drank a lot of beer and smoked pot all the time."  (*Id.*, Ex. 48 at 2.)  They hitch-hiked to Arizona and got Petitioner's truck, which Petitioner subsequently sold for a motorcycle and some cocaine.  (*Id.* at 3.)

*Analysis*

A defendant facing a death sentence has a "right – indeed, a constitutionally protected right – to provide the [sentencer] with . . . mitigating evidence."  *Williams*, 529 U.S. at 393.  An integral part of counsel's duty at sentencing is "to conduct a thorough investigation of [the defendant's] background."  *Id.* at 396.  "Judicial deference to counsel is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgements."  *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir.

2001) (en banc). "Defense counsel's use of mitigation evidence to complete, deepen, or contextualize the picture of the defendant presented by the prosecution can be crucial to persuading [the sentencer] that the life of the capital defendant is worth saving." *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005). Thus, "investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Id.* at 1001 (quoting *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)).

In support of this claim, Petitioner has proffered Pillinger's billing statement, which details all of counsel's work on the case. (Dkt. 111, Ex. 29.) It is evident from reviewing this exhibit that counsel spent little time preparing for sentencing. Although Pillinger had employed an investigator, it does not appear that any of the investigator's work prior to trial related to mitigation. Similarly, Pillinger's bill is devoid of any indication that counsel began preparation for sentencing prior to the jury's guilty verdict. Following the verdict, counsel consulted with Dr. Potts, Dr. Tuchler, jail counselor Ott, and the probation officer who prepared the PSR report; however, it is likely that most of this work related to counsel's motion for new trial based on Petitioner's treatment with Lithium given that counsel's focus during the hearing was on that issue. It is not evident that any other mitigation-related investigation was conducted. Although Pillinger consulted frequently with Petitioner and his parents prior to trial, there is no indication in counsel's billing statement that he did so in the twenty-nine days between the jury's verdict and the mitigation hearing. *See Correll v. Ryan*, ___ F.3d ___, No. 03-99006, 2008 WL 2039074, at *13-17 (9th Cir. May 14, 2008) (finding representation deficient where counsel in capital case failed to conduct any investigation, gather records, or engage in meaningful consultation with client and other witnesses prior to mitigation hearing). The absence of significant preparation for sentencing is also evident in Pillinger's abbreviated sentencing memorandum, witness examination, and oral argument.

Moreover, despite the fact that the probation department spoke to both Stepp and Thorp, counsel made no effort to contact either of them for potential mitigating evidence. In a 1985 affidavit proffered by the State during Petitioner's first PCR proceeding, Pillinger

avowed that he had no recollection of Petitioner telling him about these potential witnesses. (ROA 513, Ex. 1 at 2.)  However, counsel's duty to investigate was not alleviated simply because Petitioner did not provide a list of potential witnesses.  As has been made clear in numerous cases, counsel has a duty in any capital case to make a "diligent investigation into his client's troubling background and unique personal circumstances." *Williams*, 529 U.S. at 415.  Here, Petitioner's counsel failed to take any steps to investigate and present evidence of Petitioner's life history, including consulting with Petitioner, his adoptive parents, his biological family, and others who knew him.  This was clearly deficient. *See Summerlin v. Schriro*, 427 F.3d 623, 631 (9th Cir. 2005) (finding deficient performance where counsel failed to consult with client and conducted no investigation of client's family and social history).

Although the Court agrees with Petitioner that Pillinger's representation with regard to investigating his life history was deficient, the Court disagrees with Petitioner's characterization of the mitigating evidence counsel failed to present as "powerful." (Dkt. 108 at 85.)

The proffered evidence from Thorp, Stepp, Reverend Jackson, Cooper, and Beaulieu primarily shows that Petitioner was a difficult, hyperactive child who was teased at school and who got involved with drugs at an early age and dropped out of high school.  (Dkt. 110, Exs. 25-27, 37-38.)  Also, as described by Stepp, Petitioner felt worthless after learning that his mother had given him away but kept some of her other children and was generally depressed in the year preceding the murder because "he had messed up his life, lost his wife and let his parents down."  (Dkt. 110, Ex. 25 at 2.)  However, all of this information was before the sentencing judge in the form of the PSR, which related that Petitioner was a slow learner, dropped out of school, did a lot of drugs, "always felt rather depressed and unhappy," and was devastated after visiting his birth mother and getting divorced. (Dkt. 110, Ex. 28 at 8.)  In addition, both Drs. Berger and Tuchler noted Petitioner's depression and attempted suicides, and Dr. Tuchler relayed that Petitioner had a difficult relationship with his adoptive father and began using drugs at an early age. (Dkt. 113, Ex. 52; Dkt. 109, Ex.

17.)

Similarly, the information Petitioner now alleges should have been brought out from Mrs. James was, in relevant part, already before the sentencing judge. For example, he cites counsel's failure to elicit facts about Petitioner's behavioral and learning problems, the break-up of his short-lived marriage, and his emotional distress after traveling to California to meet his birth mother ten months before the murder. (Dkt. 108 at 52.) However, the PSR contained this information, and Mrs. James testified at the mitigation hearing that Petitioner had a troubled history prior to his adoption, which she believed had left him feeling "rejected." (RT 11/2/82 at 1406.) Although she denied knowledge that he used drugs, her professed ignorance of such things rendered this aspect of her testimony less than dispositive. (*Id.* at 1410.) Furthermore, had counsel invited Mrs. James to testify more fully about Petitioner's background and character, she may have revealed the depth of Petitioner's ingratitude, verbal abuse, deceptions, and thievery throughout his adult life – such evidence likely would not have been perceived by the sentencing judge as mitigating in nature. Indeed, this Court's reading of Mrs. James's diary reveals a broken-hearted woman who tried her best over twenty years to provide a stable, loving home to a very difficult child.

Testimony from Petitioner's ex-wife also may have been counter-productive. In her declaration, Kelley states that Petitioner had a terrible temper and was prone to rages and unpredictable mood swings. Such testimony contradicts Mrs. James's testimony that her son was not prone to rage or violence. In addition, her proposed testimony could have reinforced trial testimony from Norton and McIntosh that Petitioner was aggressive, intimidating, and the prime actor in beating and brutally killing the victim. Finally, her statement that Petitioner was "seriously mentally ill" (Dkt. 112, Ex. 40 at 1) was based solely on a layperson's viewpoint and not supported by any expert diagnosis. (*See, e.g.*, RT 11/2/82 at 1373, 1395; *see also* Dkt. 113, Ex. 52.)

Petitioner insinuates that he may have been sexually abused before age four, when he still resided with his birth mother. However, he essentially concedes that this is pure speculation and not provable because he has no such memories and there is no evidence from

any other source that he suffered abuse.[14]  The fact that his mother kept an unclean house, abused drugs, and brought home abusive, alcoholic men underscores Petitioner's good fortune in being adopted at age four – in contrast to his half-brother who remained in the home and subsequently struggled with homelessness and alcoholism.  None of the witnesses indicate that Petitioner lived in anything but a stable home after his adoption by Mr. and Mrs. James, who "indulged Steve a lot, giving him a large allowance and buying things for him." (*Id.*, Ex. 25 at 1.)  In fact, Petitioner told the PSR author that his adoptive parents, although over fifty years of age at the time of the adoption, provided him "a good, stable middle class home in which he always felt loved and protected."  (Dkt. 110, Ex. 28 at 8.)

Pillinger's performance with respect to evidence of Petitioner's background thus stands in stark contrast with the performance of counsel in *Rompilla v. Beard*, 545 U.S. 374 (2005), *Wiggins*, 539 U.S. 510, *Williams*, 529 U.S. 362, and *Summerlin*, 427 F.3d 623, cases in which counsel failed to discover and present readily available mitigating information of a nature far more persuasive than anything Petitioner has cited.  Rompilla's counsel, for example, did not examine a file concerning a previous crime despite the fact that the prosecution was using the offense as an aggravating factor; if counsel had reviewed the file, they would have discovered a wealth of mitigating information about Rompilla's childhood and mental health that was "very different[] from anything defense counsel had seen or heard."  545 U.S. at 390-91.  Similarly, in *Wiggins*, trial counsel failed to present evidence readily available from school records and medical reports of the defendant's "excruciating life history," which involved "severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother" followed by "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care."  539 U.S. at 537,

---

[14]     In an affidavit prepared for Petitioner's 1995 PCR petition, Dr. Potts asserted that the information he reviewed demonstrated that "Mr. James reports ongoing sexual and psychological abuse at an early age."  (Dkt. 113, Ex. 56 at 2.)  It is not clear where Dr. Potts gleaned this information, as Petitioner acknowledges in his merits brief that he has no recollection of the first few years of his life and states only there is a "possibility" he was molested by his uncle.  (Dkt. 108 at 64 n.30.)

535.  In *Williams*, sentencing counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing Williams's nightmarish childhood, not because of any strategic calculation but because they incorrectly thought that state law barred access to such records."  529 U.S. at 395.  In *Summerlin*, counsel failed to discover that his client's learning disabilities rendered him "functionally mentally retarded," that he was diagnosed as a paranoid schizophrenic, and that he "had a compelling childhood history of physical and mental abuse: deserted by his father who was later killed in a police shoot-out; locked repeatedly in an ammonia-fumed room by his mother; and subjected to electroshock at his mother's insistence."  427 F.3d at 642.  By contrast, none of the information Pillinger failed to present approaches the significance of the information counsel omitted in *Rompilla*, *Wiggins*, *Williams*, and *Summerlin*.  *See Pinholster v. Ayers*, 525 F.3d 742, 770-73 (9th Cir. 2008) (distinguishing the scale and quality of the mitigation not presented in *Rompilla*, *Wiggins* and *Williams*, and concluding that when mitigation evidence concerning Pinholster's background, family history and mental impairments is weighed against aggravating factors such as the vicious nature of his murders (multiple stabbings), his extensive criminal record, his history of violence and his lack of remorse, it was reasonable to conclude that no juror would have been swayed to a lesser sentence).

### Failure to Investigate Drug & Alcohol Impairment

Petitioner next contends that counsel undertook a "half-hearted" effort to establish a mental impairment mitigating factor based on Petitioner's drug and alcohol use at the time of the crime.  (Dkt. 108 at 72.)  He complains that counsel failed to ask Dr. Tuchler to re-interview Petitioner regarding his alcohol and drug use, failed to call witnesses at the mitigation hearing with first-hand information regarding Petitioner's intoxication on the day of the offense, and failed to forcefully argue intoxication as a mitigating factor in his closing argument.  (*Id.* at 73-74.)  As a result, the prosecution was able to "shred" counsel's weak arguments, and the sentencing judge rejected impairment as a mitigating factor because there was no evidence to support it, other than Petitioner "later making a self-serving statement that he had used drugs that night."  (*Id.*) (citing RT 11/23/82 at 1457.)

Under Arizona law, voluntary intoxication may be considered a mitigating factor "if the defendant proves by a preponderance of the evidence that his 'capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution.'" *State v. Stokley*, 182 Ariz. 505, 520, 898 P.2d 454, 469 (1995) (citing A.R.S. § 13-703(G)(1)). Voluntary intoxication may also be considered as a non-statutory mitigating factor. *See State v. Gallegos*, 178 Ariz. 1, 21, 870 P.2d 1097, 1117 (1994). It is for the state court to weigh any mitigating evidence and determine its significance. *See Ceja v. Stewart*, 97 F.3d 1246, 1251 (9th Cir. 1996); *see also Eddings v. Oklahoma*, 455 U.S. 104, 114-15 (1982).

Petitioner acknowledges that counsel raised drug and alcohol intoxication at the time of the killing as a mitigating factor, and the sentencing judge was aware from other witnesses that Petitioner had at least some history of drug use and drank alcohol and smoked marijuana the night before the murder. Petitioner contends, however, that counsel should have called as witnesses at the mitigation hearing Martin Norton, Daniel McIntosh, Daniel Severance, and Ross Waller to corroborate Petitioner's statement to Dr. Tuchler that he was on drugs at the time of the crime. (Dkt. 108 at 73-74.) He proffers new affidavits and deposition testimony from these individuals describing Petitioner's use of drugs and alcohol as more substantial than previously indicated in contemporaneous testimony and sworn statements. (Dkt. 109, Exs. 11-12; Dkt. 110, Exs. 20-22.)

At trial, McIntosh testified that Petitioner had "drank a couple" beers. (RT 9/22/82 at 456.) In a pretrial deposition, McIntosh claimed that he, Libberton, and Petitioner each drank approximately eight or nine cans of beer over a period of five or six hours until midnight, when McIntosh left; however, he further stated he was unsure how much any of them drank and conceded they may not have consumed the entire case of beer in their possession. (PCR-ROA at 681 (1981 McIntosh Dep. at 8, 10-11, 39).) McIntosh also indicated that he, Libberton, and Petitioner smoked a small amount of marijuana, which he described as one cigarette "and a couple of hits out of a bong, that was about it." (*Id.* at 12.) He claimed that they were all "messed up" by the time he left, but he could not really tell

how intoxicated Petitioner was at the time.  (*Id.*)  McIntosh's pretrial deposition makes no reference to Petitioner using LSD or PCP or any other drugs besides marijuana.

Norton's trial testimony makes no reference whatsoever to the use of drugs or alcohol by Petitioner.  In his pretrial statement of December 29, 1981, Norton indicated that Petitioner drank beer and possibly vodka and smoked pot in the evening hours before the murder.  (Dkt. 108, Ex. 3 at 6.)  Norton testified that when he was at Petitioner's trailer early that evening, Petitioner, Libberton, and McIntosh were drinking alcohol and smoking pot. (*Id.*)  He states that when he left the trailer at about 10:30 p.m., the others were still drinking beer and vodka and smoking pot.  (*Id.*)  He further stated they "were feeling good" and that Petitioner might have been "high" but did not seem "drunk."  (*Id.* at 6-7.)  Norton's pretrial statements made no mention of Petitioner using anything other than alcohol and marijuana. Norton also said that, from the time he arrived back at Petitioner's trailer with Maya until the time of the murder approximately five to six hours later, Petitioner drank no alcohol and smoked no marijuana.  (*Id.* at 14.)

Nearly a decade after the fact, Petitioner has obtained new affidavits from Norton and McIntosh and new deposition testimony from McIntosh asserting for the first time that Petitioner used and was under the influence of more powerful drugs the night before the murder.  In contrast to his testimony at trial and in his pretrial deposition, McIntosh now asserts that, in addition to smoking marijuana and drinking a case of beer between them, he and Petitioner also "dropped acid."  (Dkt. 109, Ex. 12 at 21; Dkt. 110, Ex. 20 at 2.)  "When I left that night, I was slurring my speech and could hardly walk.  Larry [Libberton] and [Steven] James were in the same condition, but they did not seem to be as sleepy as I was." (Dkt. 110, Ex. 20 at 2.)  McIntosh also vastly increased his estimate of the amount of marijuana they smoked that night.  (Dkt. 109, Ex. 12 at 18-19.)  Norton has also expanded on his pretrial statement, claiming in a 1991 affidavit that, in addition to drinking alcohol and smoking "some" marijuana, they had ingested "black beauties, which is a type of speed."

(Dkt. 109, Ex. 11 at 3.)[15]  This new evidence contrasts sharply with McIntosh's and Norton's earlier sworn statements and testimony.

Even assuming counsel was deficient in investigating and presenting evidence of Petitioner's mental impairment due to substance abuse, and further assuming that if he had been diligent he could have obtained and presented evidence from Norton and McIntosh that Petitioner's use of drugs the night before the murder was far greater than previously indicated, Petitioner cannot establish prejudice.  Evidence presented at trial was replete with examples of Petitioner's lucidness and calculation as he carried out the crimes, and the evidence indicated that he was the prime instigator and leader in the murder.  Norton recounted, in chilling detail, Petitioner's calculated decision that they had to kill Maya (contrary to Norton and Libberton's desire to release him) because if they let him go after assaulting and robbing him, he could report them to the authorities.  (RT 9/27/82 at 773-74; Dkt. 108, Ex. 3 at 12-13, 15.)  Thus, Petitioner was clearly aware of the wrongfulness of his conduct.  *See State v. Greene*, 192 Ariz. 431, 441-42, 967 P.2d 106, 116-17 (1998) (finding no evidence supporting either statutory or non-statutory mitigation based on intoxication impairment where defendant displayed knowledge of wrongfulness of action by taking steps to conceal crime).

Norton also testified that no drugs or alcohol were consumed in the hours between formulation of the plan to kill and its execution.  During the hours-long ordeal, Petitioner drove Maya's vehicle; was pulled over and spoke with a police officer, who let him go after checking his identification and who presumably did not observe any signs of intoxication; and successfully led the group to an abandoned mine in a remote, rural area.  In addition, Petitioner clearly recalled the events, as evidenced by McIntosh's testimony, which coincided

---

[15]      Petitioner has also proffered a 1987 affidavit from a former roommate, Daniel Severance, and a 2007 affidavit from a friend of Norton's, Ross Waller.  (Dkt. 110, Exs. 21-22.)  Both claim they saw Petitioner the day and night before the murder and that he had been drinking, but neither claims they saw Petitioner taking any mind-altering drugs.  (*See id*.)  All told, none of the evidence with regard to the type and amount of drugs and alcohol consumed by Petitioner is consistent.

with that of Norton, and by the fact that Petitioner was able to lead police back to the murder site. Nothing in the new affidavits and deposition testimony refutes this evidence, and both the sentencing judge and the Arizona Supreme Court found, based on this record, that Petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law's requirements was not impaired. *James*, 141 Ariz. at 148, 685 P.2d at 1300.

### Failure to Investigate Mental Impairment

Petitioner contends that Pillinger ignored "a series of red flags indicating that [he] had serious mental problems" and failed to effectively present Petitioner's compromised mental state as a mitigating factor. (Dkt. 108 at 75-76.)

Petitioner correctly asserts that counsel was aware of the following from Dr. Tuchler's pretrial competency evaluation of Petitioner:

> that [Petitioner] had a disturbed childhood, experienced difficulty relating to his adoptive father, dropped out of high school, had a long history of drug abuse, had attempted suicide on several occasions, had been abandoned by his former wife because she believed he was "crazy," and had recently attempted suicide in the jail while awaiting trial on the murder charge, by slashing his wrist. [One] psychiatrist examined Mr. James's wrists and found evidence of a "rather typical suicide gesture."

(*Id.*) Nonetheless, counsel failed to follow up on this information for purposes of developing mitigating evidence. Similarly, counsel learned from Jerry Ott prior to trial that Petitioner was being counseled weekly and was receiving psychiatric treatment at the jail, yet failed to obtain Ott's or the jail's medical records prior to the start of the mitigation hearing. Pillinger also failed to avail himself of the trial court's offer to reappoint Dr. Berger or Dr. Tuchler to conduct further evaluation of Petitioner after denying counsel's request for appointment of Dr. O'Brien. (ROA 234 (ME 8/11/82).) Finally, after being affirmatively contacted by Dr. Potts, one of Petitioner's treating psychiatrists at the jail, counsel focused his post-trial efforts with Dr. Potts on numerous motions for new trial, rather than on mitigation, and never sought to have any of the experts familiar with Petitioner evaluate him for purposes of mitigation.

As outlined above, evidence relating to Petitioner's mental state at the time of the killing and in the period prior to trial was before the sentencing judge. The court heard

testimony and reviewed records indicating that Petitioner had been classified as a suicide risk at the jail and had twice attempted suicide. The court also knew that Petitioner had a history of depression and anger control problems and had some history of psychological treatment for these issues. Further, the court knew that Petitioner had received extensive treatment and examination by mental health professionals during the one-year period of time he was in jail prior to trial. The court stated that it had considered the full record submitted at sentencing (RT 11/23/82 at 1450, 1452-53), and this Court cannot presume that the court failed to take this evidence into consideration, irrespective of how little it was emphasized by counsel. *See Parker v. Dugger*, 498 U.S. 308, 315 (1991) ("We must assume that the trial judge considered all this [mitigation] evidence before passing sentence. For one thing, he said he did.").

Petitioner points to newly-discovered information concerning psychiatric problems in numerous members of his biological family. However, neither Dr. Berger nor Dr. Tuchler found any evidence of mental disease or thought disorder when they examined Petitioner four months after his arrest, and Petitioner does not now allege that he suffered from any such disturbance. (Dkt. 113, Ex. 52 at 2; Dkt. 109, Ex. 17 at 3-4.) Petitioner also relies on a 1995 affidavit from Dr. Potts, who treated him while he was in jail pending trial and diagnosed him as suffering from Cyclothymic Disorder. As explained in the affidavit, Cyclothymic Disorder is an attenuated form of manic-depressive illness "characterized by chronic, fluctuating moods involving periods of hypomania, and/or depression frequently with marked irritability as a frequent presenting symptom." (Dkt. 113, Ex. 56 at 1.) Thus, Dr. Potts found that Petitioner suffered from a mood disorder, not a mental disease or defect that interfered with his ability to control his conduct or distinguish between right and wrong.

### Cumulative Effect

In assessing whether counsel's representation at sentencing resulted in prejudice, the Court considers the totality of the mitigation, weighs it against the aggravation, and determines whether there is a reasonable probability that the sentence would have been different had the additional information been presented. *Wiggins*, 539 U.S. at 534. In

Arizona, the Arizona Supreme Court has developed an extensive body of caselaw with regard to mitigation and has directed that the sentencer consider "the quality and strength of those factors." *State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006).  While mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, the lack of a causal (explanatory) connection may be taken into account when assessing the weight of the evidence.[16]  *Id.*; *see, e.g.*, *State v. Hampton*, 213 Ariz. 167, 185, 140 P.3d 950, 968 (2006) (finding horrendous childhood less weighty and not sufficiently substantial to call for leniency, in part, because not tied to the offense).  When the experts indicate that a defendant "knew right from wrong and could not establish a causal nexus between the mitigating factors and [the] crime," Arizona courts may ascribe limited value to evidence of an abusive childhood, substance abuse, and personality disorders.  *State v. Johnson*, 212 Ariz. 425, 440, 133 P.3d 735, 750 (2006).

In light of these principles, the Court concludes that the limited new information Petitioner offers about his life history is not of significant weight.  *See Brown v. Ornoski*, 503 F.3d 1006, 1014 (9th Cir. 2007) (finding that additional abuse evidence unlikely to alter outcome where similar information was presented at sentencing); *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995) (finding "of little value" additional facts regarding petitioner's difficult childhood where evidence of childhood abuse was presented at sentencing).  While

---

[16]    Petitioner argues that counsel's failure to emphasize mitigation information that had a connection to the offense was highly prejudicial but also asserts that insistence on such a connection to establish prejudice is contrary to the Supreme Court's decision in *Tennard v. Dretke*, 542 U.S. 274, 289 (2004).  This Court disagrees with Petitioner's assertion that the Court in *Tennard* "rejected the notion that mitigation evidence needed an 'explanatory nexus' to be entitled to prejudicial weight."  (Dkt. 142 at 39 n.14.)  Rather, in *Tennard* the Court found violative a jury instruction that required a causal connection simply to establish the proffered mitigation evidence as *relevant*.  The question of relevancy is clearly separate from that of how much weight to accord relevant mitigating evidence; the latter of which is left to the sentencer's discretion.  *See Ortiz v. Stewart*, 149 F.3d 923, 943 (9th Cir. 1998) ("While it is true that a sentencer may not 'refuse to consider, *as a matter of law*, any relevant mitigating evidence,' a sentencer is free to assess how much weight to assign to such evidence.") (internal citations omitted); *see also Allen v. Woodford*, 395 F.3d at 1006 (recognizing that explanatory mitigation evidence is more weighty).

Petitioner has provided a more detailed description of his early life history, it is clear that the sentencing judge was aware of most of these facts and considered all of the information available, including the PSR, trial testimony, and testimony at the mitigation hearing.

Similarly, the Court accords little weight to Petitioner's claim that he was intoxicated at the time of the crime and had a history of substance abuse. Evidence of actual impairment is slim, and Petitioner's "new" evidence of drug and alcohol impairment is contrary to the witnesses' contemporaneous testimony and undermined by his clear recollection of the crime. As the Ninth Circuit has noted, "defenses based on abuse of dangerous drugs in evaluating a defendant's culpability for violent behavior" are generally disfavored by a sentencer. *Mayfield v. Woodford*, 270 F.3d at 931 n.17. In Arizona, "[t]he fact that a defendant was to some degree intoxicated is not, by itself, a mitigating circumstance" absent a showing that intoxication impaired a defendant's ability to control his conduct. *State v. Woratzeck*, 134 Ariz. 452, 458, 657 P.2d 865, 871 (1983); *see also State v. Jordan*, 126 Ariz. 283, 290, 614 P.2d 825, 832 (1980). Petitioner argues that his long-standing drug and alcohol abuse is entitled to significant mitigating weight; however, the Arizona Supreme Court has held otherwise when, as here, a defendant failed to take steps to confront and resolve his substance abuse problems. *State v. Gallegos*, 185 Ariz. 340, 345, 916 P.2d 1056, 1061 (1996).

Petitioner also argues that the evidence he has proffered here demonstrates that the killing was a result of his emotional unraveling, culminating in his discovery ten months prior to the offense that his biological father was a heroin addict and felon, that his birth mother had given him up for adoption while keeping other children, and that his half-brother had been sexually abused by their mother's brother. (Dkt. 142 at 40-41.) He further asserts that after meeting his half-brother in January 1981, Petitioner and Isgrigg consumed substantial amounts of drugs together and Petitioner felt the need to "protect" Isgrigg as a result of the abuse he had suffered. Thus, when Norton, a fourteen-year-old runaway taken in by Petitioner, relayed the victim's homosexual advances, Petitioner acted to protect him. (*Id.* at 41-44.) Citing *Mayfield v. Woodford*, Petitioner argues that these "transformative

events" exacerbated his life's problems, "resulting in a substantial impairment in his ability to control his impulses when confronted with the victim's attempted sexual assault on the teenager living with him." (*Id.* at 45-46.)

The Court disagrees. First, nothing about this crime evidences impulsive behavior. Petitioner, Libberton, and Norton took turns beating the victim. Petitioner took the victim's wallet, bracelet, and ring, and then decided that the victim had to be killed. He suggested the abandoned mine site and drove two hours to that location. The facts underlying the offense belie his claim of acting impulsively to protect Norton. Second, the sentencing judge was aware through the experts' pretrial evaluations, the jail records, and the PSR that Petitioner had twice attempted suicide after being arrested and was depressed in the year prior to the murder after getting divorced, breaking up with a girlfriend, and meeting his biological family. The pretrial experts also specifically found that Petitioner did not suffer from a mental disease or thought disorder at the time of the crime. Third, Petitioner's case differs from that in *Mayfield*. There, the evidence counsel failed to present included the fact that chronic PCP users such as Mayfield may experience occasional bizarre episodes of violent behavior, impaired judgment, decreased impulse control, decreased stress tolerance, and impaired reality testing; that Mayfield suffered from diabetes and was hospitalized a few months before the crime with an excessively high blood sugar level; and that Mayfield was a helpful, generous person who was not ordinarily violent. *Mayfield*, 270 F.3d at 931-32. In addition, the crime in *Mayfield* is not nearly as heinous or cruel as that here.

Dr. Potts opines in a 1995 affidavit that Petitioner's ability to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was greatly affected by his "mental disorder, acute intoxication, chronic drug abuse, and family background." (Dkt. 113, Ex. 56 at 2.) However, this opinion appears speculative at best given the minimal evidence of Petitioner's intoxication and Dr. Potts's unfounded belief that Petitioner had been sexually and psychologically abused as a child. In addition, Dr. Potts explained that Cyclothymic Disorder is not a thought-altering type of disorder, but a lesser form of manic depression – a mood disorder. (*Id.* at 1-2.) The Court concludes that

Petitioner has not established that his depression and mood disorder impaired his ability to control or appreciate the wrongfulness of his conduct; therefore, they are not particularly compelling as mitigation. As the Arizona Supreme Court recently reiterated, "we weigh mental health mitigation in proportion to a defendant's ability to conform or appreciate the wrongfulness of his conduct." *State v. Boggs*, ___ Ariz. ___, 185 P.3d 111, 130 (2008) (finding proffered mitigation not sufficiently substantial to call for leniency where no expert testified Boggs did not know right from wrong, and none could establish his mental state at the time of the crime). "Without a causal link between the murders and his troubled childhood or mental health issues, these mitigating circumstances are entitled to less weight." *Id.*; *see also State v. Johnson*, 212 Ariz. at 440, 133 P.3d at 750 (according evidence of personality disorders, difficult childhood, and substance abuse only minimal value because defendant knew right from wrong and there was no causal nexus between these factors and the crime).

Weighed against Petitioner's mitigation is compelling evidence of the circumstances surrounding Maya's murder and Petitioner's role in it. Powerful testimony was presented at trial of Petitioner's active and leading role in planning and carrying out Maya's brutal and callous murder. Petitioner himself testified that he was present at Maya's murder. He admitted that he drove Maya, Libberton, and Norton to the murder site, and that he participated in dumping the body in the mineshaft. Although he claimed his participation was coerced, strong evidence supports the conclusion that this claim was not credible, as found by the sentencing court. (RT 11/23/82 at 1457-58). Morever, the victim was made to listen as Petitioner and the others openly discussed killing him over a several-hour period. They taunted and beat him beyond recognition – all apparently motivated by a hatred for homosexuals. Afterward, Petitioner laughed and smiled when he told McIntosh how he had broken Maya's nose with one punch and all the efforts it took to kill him when the gun misfired. (RT 9/22/82 at 485-89.) The multi-hour ordeal was clearly excruciating both physically and mentally for the victim and evidences the cruel, heinous, and depraved manner in which it was carried out.

Reweighing the evidence in aggravation against the totality of available mitigating evidence, the Court concludes that there is no reasonable probability the additional evidence, had it been presented, would have resulted in a sentence less than death. *See Allen v. Woodford*, 395 F.3d at 1006 ("We have rarely granted habeas relief based solely on humanizing, rather than explanatory, mitigation evidence in the face of extensive aggravating circumstances."). Thus, even assuming Petitioner exercised due diligence in developing this claim in state court, he is not entitled to further evidentiary development in this Court because he has not alleged facts which, if proved, would entitle him to relief.[17]   *See Townsend*, 372 U.S. at 312-13.

## CERTIFICATE OF APPEALABILITY

In the event Petitioner appeals from this Court's judgment, and in the interests of conserving scarce Criminal Justice Act funds that might be consumed drafting an application for a certificate of appealability to this Court, the Court on its own initiative has evaluated the claims within the petition for suitability for the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d at 864-65.

Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a certificate of appealability (COA) or state the reasons why such a certificate should not issue. Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n. 4 (1983)).  For

---

[17]     To support his prejudice allegations, Petitioner proffered numerous witness declarations as well as other documentary evidence for which he requests expansion of the record.  (*See* Dkts. 109-114.)  In determining that further evidentiary development is not warranted, the Court has given full consideration to this material, has assumed its veracity, and has discussed many aspects of it in evaluating whether Petitioner was prejudiced by counsel's ineffectiveness at sentencing.

procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

The Court finds that reasonable jurists could debate its resolution of the issues set forth in Claims 1, 2, and 15. The Court therefore grants a certificate of appealability as to these issues. For the reasons stated in this Order and the Court's Order regarding the procedural status of Petitioner's claims filed on July 24, 2006 (Dkt. 79), the Court declines to issue a certificate of appealability for Petitioner's remaining claims and procedural issues.

## CONCLUSION

For the reasons set forth above, Petitioner is not entitled to habeas relief. The Court further finds that evidentiary development is neither warranted nor required.

Accordingly,

**IT IS HEREBY ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. 18) is **DENIED**. The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** granting a Certificate of Appealability as to the following issues:

> Whether Claim 1, alleging Petitioner was denied due process of law because the State failed to disclose an agreement it made before trial with Martin Norton, a witness who was indispensable to the State's case, fails on the merits;

> Whether Claim 2, alleging Petitioner was denied due process of law when the State prevented Martin Norton from testifying freely, and instead required him to testify consistent with prior statements he had made, fails on the merits; and

> Whether Claim 15, alleging sentencing counsel's failure to investigate and present mitigating evidence, fails on the merits.

**IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, Arizona 85007-3329.

DATED this 18th day of July, 2008.

_____
Neil V. Wake
United States District Judge